E-FILED
Friday, 29 May, 2020  04:48:03 PM
Clerk, U.S. District Court, ILCD

IN THE UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS, URBANA DIVISION

# Complaint

HYE-YOUNG PARK, a/k/a LISA PARK,

Plaintiff


v.

Case No:


THE BOARD OF TRUSTEES OF THE UNIVERSITY OF ILLINOIS,

MENAH PRATT-CLARKE,
HEIDI JOHNSON,
KAAMILYAH ABDULLAH-SPAN,
MICHAL T. HUDSON, in their individual and official capacities,


Defendants.                                    JURY TRIAL UNDECIDED



    NOW COMES the Plaintiff, HYE-YOUNG PARK, and for her Complaint against

Defendants MENAH PRATT-CLARKE, HEIDI JOHNSON, KAAMILYAH ABDULLAH-

SPAN, MICHAL T. HUDSON, and THE BOARD OF TRUSTEES OF THE UNIVERSITY OF

ILLINOIS, alleges as follows:

**TABLE OF CONTENTS**

I.  OVERVIEW...................................................................................................1

II.  JURISDICTION.............................................................................................3

III.  PREVIOUS LAWSUITS.................................................................................3

IV.  SUITABILITY...............................................................................................7

    Ultra Vires Acts.............................................................................................7

    Tolling........................................................................................................23

V.  STATEMENT OF THE CASE AND FACTS................................................24

VI.  POLICY AND LAW.....................................................................................46

VII.  STATEMENT OF CLAIM AND RELIEF......................................................57

    Claim..........................................................................................................57

    Relief..........................................................................................................71

VIII.  CONCLUSION.............................................................................................77

IX.  STATEMENT OF VERIFICATION.............................................................78

X.  JURY DEMAND UNDECIDED....................................................................79

XI.  CERTIFICATE OF SERVICE......................................................................80

XII.  APPENDIX I................................................................................................81

Evidence of Defendants' continuous denial of Park's status at the University....................81

Evidence of Kaamilyah Abdullah-Span and Menah Pratt-Clarke's deep involvement
 in the case from the beginning along with M.T. Hudson and Heidi Johnson.......................86

Evidence of Secolsky's continuous sexual harassment and retaliation (Overview)..........108

Evidence of Secolsky's continuous sexual harassment and retaliation after June 21, 2014............133

Evidence of Park and Secolsky's University-related work in 2014......................................158

Evidence of Secolsky's activities at the University in 2012-2014.......................................170

Evidence of Park's psychological and physical injuries.........................................................172

Miscellaneous evidence.....................................................................................................186

XIII.    APPENDIX II

A. Policy and Procedures for Addressing Discrimination and Harassment at UIUC

B. Title IX, US Department of Education Office for Civil Rights (Title IX)

C.  Questions and Answers on Title IX and Sexual Violence, US Department of Education Office for Civil Rights (Title IX Q & A)

D. Additional Significant Evidence

E. Additional Significant Medical Records

## I.        OVERVIEW                                   Table of content

This case involves the sexual misconduct and retaliation of two senior scholars, Robert E. Stake, a professor, and Charles Secolsky, a visiting researcher, towards Hye-Young Park (also known as Lisa Park, hereinafter "Park") at the University of Illinois, Urbana Champaign (hereinafter "University" or "UIUC").

This case is also involves University Officials' and their violation of the "Policy and Procedures for Addressing Discrimination and Harassment at the University of Illinois, Urbana-Champaign" (hereinafter "University Policy")[1] and Federal law, specifically, the "Revised Sexual Harassment Guidance: Harassment of Students By School Employees, Other Students, or Third Parties, Title IX, US Department of Education Office for Civil Rights" (hereinafter "Title IX")[2] and their subsequent retaliation against Park after she exercised her statutorily protected activities, challenging Defendants' false claims, deliberate indifference, and reckless misconduct.

Park's current complaint, however, only focuses on Defendants' misconduct: their deliberate indifference, discrimination, and retaliation against her after she filed a complaint about Secolsky's sexual harassment and retaliation to the Office of Diversity, Equity, and Access (hereinafter "ODEA"). [3] Park filed prior lawsuits with this Court; however, many rulings were founded on fabrications manufactured by the Judge's ultra vires acts as discussed hereinafter. Therefore, this Court cannot dismiss Park's current pro se Complaint by concluding that it is frivolous or malicious under § 1915(e)(2)(B)(i).

---

[1] See Appendix II. Policy and Procedures for Addressing Discrimination and Harassment at UIUC.

[2] See Appendix II. Title IX, US Department of Education Office for Civil Rights (Title IX).

[3] In late 2017, ODEA was changed to the Office for Access & Equity (OAE). ODEA is used herein since it was the name for the Office during the relevant period.

**Defendants** are the Board of Trustees, Michal T. Hudson, Heidi Johnson, Kaamilyah Abdullah-Span, and Menah Pratt-Clarke[4] while the following parties are involved in the current case:

| | |
|---|---|
| The Board of Trustees (hereinafter "The Board") | Body corporate and politic 352 Henry Administration Building, MC-350 506 S. Wright St. Urbana, IL 61801 UIBOT@uillinois.edu |
| Michal T. Hudson (hereinafter "Hudson") | Senior Title IX and ADA Specialist, at ODEA 616 E. Green Street Champaign, Illinois 61820 mthdsn@illinois.edu |
| Heidi Johnson (hereinafter "Johnson") | Director, ODEA 616 E. Green Street Champaign, Illinois 61820 johnso19@illinois.edu |
| Kaamilyah Abdullah-Span (hereinafter "Abdullah-Span") | Senior Associate Director, ODEA Hudson's supervisor 616 E. Green Street Champaign, Illinois 61820 kabdulla@illinois.edu |
| Menah Pratt-Clarke (hereinafter "Pratt-Clarke") | Associate Chancellor, Associate Provost for Diversity, Office of the Chancellor (Title IX, ADA and 504 Coordinator) 303 International Studies Building 910 South Fifth Street Champaign, IL 61820 menahpc@illinois.edu |
| Robert E. Stake | Professor Emeritus; Director, the Center for Instructional Research and Curriculum Evaluation (CIRCE); Instructor for EPSY 490E course |

4 Depending on the context, Defendants will be referred to as (1) the Board of Trustees, Abdullah-Span, Pratt-Clarke, Hudson, & Johnson; (2) Abdullah-Span, Pratt-Clarke, Hudson, & Johnson; or (3) ODEA.

| (hereinafter "Stake") | 192 Children's Research Center<br>51 E. Gerty Champaign, IL 61820<br>stake@illinois.edu |
|---|---|
| Charles Secolsky (hereinafter "Secolsky") | a Visiting Researcher at CIRCE;<br>Instructor for EPSY 490E course |

## II.    JURISDICTION Table of content

This Court has jurisdiction over the claims pursuant to (a) 28 U.S.C. § 1331 because some of the claims arose under federal law; (b)  28 U.S.C. §1391 because the occurrences took place in Champaign County; and (c) 28 U.S.C. §1367(a) for the Court's supplemental jurisdiction over the state claim.

## III.    PREVIOUS LAWSUITS

1. Plaintiff Park filed her first lawsuit against Stake, Hudson, Johnson, and The Board of Trustees in this Court (Case No. 15-2136) and appealed (Case Nos. 18-3017 & 18-3225). The Seventh Circuit affirmed this Court's ruling in October 2019 by blindly following this Court's fabrications.[5] Park filed a petition for writ of certiorari to the Supreme Court, which was denied on April 27, 2020.

2. During the discovery in Case No. 15-2136, it was uncovered that Abdullah-Span and Pratt-Clarke had also been deeply involved in Park's complaints and claimed that Park had no status at the University.[6]

---

[5] See the Seventh Circuit Order #84-2 for the fabrications.
[6] See Appendix I. Evidence of  Kaamilyah Abdullah-Span and Menah Pratt-Clarke were deeply involved
 in the case from the beginning along with M.T. Hudson and Heidi Johnson.

3. This led Park to file another lawsuit to add Abdullah-Span and Pratt-Clarke (Case 18-2090). This Court terminated the case (18-2090) by applying the doctrine of *res judicata* under 28. U.S.C. 1915(e)(2)(B)(i). Park appealed the decision (Case 18-2101).

On appeal, the Seventh Circuit agreed with Park that the addition of the two new defendants defeats the doctrine of *res judicata*.[7] However, they dismissed the case under the doctrine of *collateral estoppel* by, again, blindly following fabrications in this Court's rulings over Case 15-2136 instead of looking at Park's Complaints (#s 1, 5, & 7).[8]

| Court | Suit One | Suit Two |
|---|---|---|
|  | (Hudson, Johnson, & the Board) | (Abdullah-Span, Pratt-Clarke, & The Board) |
| Seventh Circuit | 18-3017 & 18-3225 | **18-2101  Order #22 was influenced by Order #162.** |
| District Court | **15-2136**<br><br>**Order #162 was based on multiple fabrications.** | 18-2090<br>(Complaints #s 1, 5, & 7) |

Among others, this Court ruled based on the fabrication that "Park could not point to any instance of harassment after she complained to the ODEA," thus there was nothing for Hudson and Johnson to correct:[9]

---

[7] See Appellant's Brief #21 and the Seventh Circuit Order #22, 18-2101.

[8] While the District Court dismissed Park's complaint #1, 18-2090, it granted her Supplements to Complaint #1 (#5 & #7, 18-2090), which is ironic as Supplement #5 is another version of complaint #1, where Park cites Section D: EXHIBITS from #1.

[9] See Appendix I. Evidence of Secolsky's continuous sexual harassment and retaliation after June 21, 2014 Park pointed out. See also "Fabrication #1" hereinafter.

Seventh Circuit Order in Docket #22, p.4  Case # 18-CV-2101

failure to stop the harassment. The district court concluded in the first suit that the

Case: 18-2101     Document: 22     Filed: 11/21/2018     Pages: 4

No. 18-2101                                                           Page 4

Board was not responsible for the harassment she suffered because Park could not point
to any instance of harassment after she complained to the ODEA. Similarly, regarding
her allegations here of discrimination based on sex and national origin, the district court
determined in the first suit that Park could not identify a single instance of harassment
after she complained to the ODEA, so no university defendant could be liable for failing
to correct a situation that did not require remedying. Finally, regarding Park's
allegations here of retaliation based on race, sex, and national origin, the district court
determined in the first suit that there was no causal link between her complaint to the
ODEA and her professor ending her immigration sponsorship.

AFFIRMED

Therefore, the Seventh Circuit ruled that, because there was nothing for Hudson and

Johnson to correct, Abdullah-Span and Pratt-Clarke were also not responsible for the

harassment Park suffered.

4. This led Park to file another lawsuit against all Defendants (Case No. 19-cv-2107); this

Court then dismissed the case applying the doctrine of res judicata and collateral estoppel.

| Defendants for 15-2136 | Defendants for 18-2090 | Defendants for 19-2107 |
|---|---|---|
| The Board of Trustees<br>Michal T. Hudson<br>Heidi Johnson<br>Robert E. Stake<br>Charles Secolsky | The Board of Trustees<br>Kaamilyah Abdullah-Span<br>Menah Pratt-Clarke | The Board of Trustees<br>Michal T. Hudson<br>Heidi Johnson<br>Kaamilyah Abdullah-Span<br>Menah Pratt-Clarke<br>Robert E. Stake |

| Court | Suit One<br>(Hudson, Johnson, & the Board) | Suit Two<br>(Abdullah-Span, Pratt-Clarke, & The Board) | Suit Three<br>(All Defendants) |
|---|---|---|---|
| Seventh Circuit | 18-3017 & 18-3225<br><br>Dismissed by affirming Order #162. | **18-2101; Order #22 was influenced by Order #162.** | This Court advised Park not to litigate.[10] |
| District Court | **15-2136**<br><br>**Order #162 was based on multiple fabrications.** | 18-2090<br>(Complaints #1, 5, 7) Dismissed via res judicata. | **19-2107; Order #6 was influenced by Order #22.** |

---

[10] Park did not appeal because this Court advised her not to litigate against the University and its officials while "Case No. 15-CV-2136 is still on appeal before the Seventh Circuit." (#6, p.4, Case No. 19-CV-2107).

# IV.    SUITABILTIY

Table of content

## Ultra Vires Acts

This Court cannot conclude that Plaintiff's current pro se Complaint is frivolous because it is barred by the doctrine of res judicata or collateral estoppel under § 1915(e)(2)(B)(i).[11]

"Generally, res judicata is the principle that a cause of action may not be relitigated once it has been judged <u>on the merits</u>."[12]

Similarly,

"As a subgenre of res judicata, collateral estoppel prevents subsequent litigation of legal determinations of <u>fact and law</u> that have resulted in valid final judgments."[13]

For res judicata or collateral estoppel to apply, a final judgment <u>on the merits</u> must have been obtained in a previous adjudication.[14]  On the merit refers to a "ruling of a court based upon <u>the facts presented in evidence</u> and the law applied to that evidence."[15] However, the judgments in Case No. 15-CV-2136 were based on the nonfactual facts or misleading statements (hereinafter "fabrications"),[16] which led the Seventh Circuit to also affirm the Judge's dismissal of Park's prior cases.

---

[11] https://www.law.cornell.edu/uscode/text/28/1915

(2) (…) the court shall dismiss the case at any time if the court determines that—
(B)the action or appeal—
        (i)is frivolous or malicious;

[12] https://www.law.cornell.edu/wex/res_judicata  emphasis added.

[13] https://www.law.cornell.edu/wex/collateral_estoppel emphasis added.

[14] http://www.querrey.com/images/LawManual/Ch_10F_Res_Judicata.pdf

[15] https://www.law.cornell.edu/wex/on_the_merits

[16] This Court dismissed Case Nos. 18-CV-2090 and 19-CV-2107 by applying the doctrine of res judicata and/ or collateral estoppel while referring to Case No. 15-CV-2136 as a previous adjudication.

The Judge in Case No. 15-CV-2136 committed ultra vires acts, approving many fabrications including, but not limited to, the following:

**Fabrication #1:** This Court fabricated that:                          Table of content

> "The district court concluded in the first suit [15-2136] that the Board was not responsible for the harassment she suffered because <u>Park could not point to any instance of harassment after she complained to the ODEA.</u> Similarly, regarding her allegations here of discrimination based on sex and national origin, the district court determined in the first suit that <u>Park could not identify a single instance of harassment after she complained to the ODEA,</u> so no university defendant could be liable for failing to correct a situation that did not require remedying[.]"(emphasis added). [17]

On the contrary, Defendants acknowledged Secolsky's continuous harassment after being alerted as stated in an ODEA report: "it has been determined that Respondent Secolsky, whom Complainant [Park] alleges <u>continues to inappropriately engage her</u> (…)." [18]

Defendants also acknowledged Park's claims that "Secolsky called her multiple times to run errands, such as getting things from the pharmacy and clean his apartment, invited her to lunch, and left messages with no content. (Park Dep., pp. 259-260, 264-267)." (MSJ #125, p. 54, UMF ¶ 62, 15-2136).

A few examples of Secolsky's harassment after alerting ODEA include repeatedly making numerous unwanted calls, leaving countless voice messages coercing Park to come over to his

---

[17] See the Seventh Circuit Order in Docket #22, p.4 Case # 18-CV-2101 or Park v. Board of Trustees of the University of Illinois 754 Fed. Appx. 437, 438-439 (7th Cir. Nov.21, 2018), which, this Court asserts, "succinctly summed up" Park's prior cases ( #6, p.2, 19-CV-2107).

[18] See Appendix I. Miscellaneous evidence for ODEA Reports  dated November 26, 2014. Emphasis added.

place, and even standing outside her apartment window and calling her name. This is just the tip

of the iceberg. Park repeatedly submitted significant evidence of Secolsky's continuous sexual

harassment that occurred after alerting ODEA, which Secolsky admitted in his filings.[19]

*Additional fabrication*: This Court also fabricated that "Plaintiff herself testified in her

deposition that, while Secolsky bothered her during the July 1 through August 2, 2014 period, he

did not do anything she considered 'sexual harassment.'"[20] However, Park continuously testified

that Secolsky's sexual harassment continued after she alerted ODEA (Park Dep. #125-1, emphasis

added):

> **Q.** ( ... ) So, we were discussing before we got sidetracked here, that **you
> allege there was sexual harassment by Dr. Secolsky to you after June 25th,
> 2014, do I understand that correctly**?
> A. **Yes**." (p.249).
>                                         ***
> "**A. I am certain that there was sexual harassment** during July 1st to July 16th.
> That's why I keep sending  [Hudson] e-mail to update, update, update, up until-" (p.253).

Therefore, for res judicata or collateral estoppel to apply, this Court must prove that "Park

could not point to any instance of harassment after she complained to the ODEA."

**Fabrication #2:** This Court fabricated that:

> "Plaintiff has presented no evidence that this alleged harassment was done in the context
> of Secolsky's and Plaintiff's respective relationships with the University, as opposed to
> Plaintiff's private employment with Secolsky's company" (# 162, p.48, 15-2136).

---

[19] See Appendix I. Evidence of Secolsky's continuous sexual harassment and retaliation after June 21, 2014 for Secolsky's admittance. On June 21, 2014, Park notified Stake of Secolsky's misconduct.

See Appendix I. Evidence of Secolsky's continuous sexual harassment and retaliation (Overview).

[20] Court Order #306, p.3 footnote 1.

Such claims contradict this Court's own acknowledgment of Park and Secolsky's University-related work throughout 2014[21] as this Court simultaneously stated this uncontested fact:

> "37. Plaintiff worked with Secolsky on grant proposals including American Educational Research Association (AERA) grant proposal [in Jan. 2014], a session at International Congress of Qualitative Inquiry (ICQI) conference at the University, a conference paper to the Center for Culturally Responsive Evaluation and Assessment (CREA) at the University [in Sept. 2014] and the Thailand Seminar Series at the University in [March & April 2014]." (#212-1, uncontested facts p.4, 15-2136).[22]

*Additional fabrication*: Further, this Court fabricated a false date, claiming: "Plaintiff had been hired by Secolsky to work for his private company on July 1, 2014." (Court Order #306, p.3, 15-2136, emphasis added). Again, this claim contradicts this Court's own acknowledgement of uncontested facts #67 and #73 which states, "[Park's] job officially started on or about July 15, 2014" and "Plaintiff worked for Secolsky's company (…) for approximately two weeks (from July 15 to July 28, 2014), and she was paid for those two weeks." (#212-1, p.6,  15-2136, emphasis added).

---

[21] See Appendix I. Evidence of Park and Secolsky's University-related work in 2014 for a short list.

[22] Court's EXHIBIT A: Stipulation of Uncontested Facts and Issues #212-1, 15-2136.

Park filed a detailed, two hundred and three-page long list of their University-related work from January 2014 to September 2014 numerous times to Defendants and before the District Court. See Exhibit C. pp. 1-203, Case No. 18-cv-2090 for a detailed list.

In the same docket #212-1, p.6, 15-2136,  this Court also states "67. Her job officially started on or about July 15, 2014, however she would also work in the winter and spring of 2014 on AERA, QI, Thai Program, and CREA." This statement is misleading because this work is related to the University, not Secolsky's company. In fact, during the discovery, it was found that Secolsky's companies were dormant.

University Attorneys subsequently exploited this Court's fabrication of July 1: "The District Court pointed out that all of the materials in her motion to supplement referenced conduct that occurred after Plaintiff had been hired by Secolsky to work for his private company on July 1, 2014," (#44, p.15, 18-3225, emphasis added).

*Additional fabrication*: Further, the Seventh Circuit also included another fabrication, stating, "Five months after she began working for him, Secolsky decided to end her job" (#74, p. 3, 18-3017, emphasis added). Park was not employed under Secolsky's company on July 1, nor was she employed for five months. Park's only employment with his company lasted two weeks, from July 15 to July 28.[23]

Furthermore, this Court acknowledged that *even during the two weeks,* Park and Secolsky worked on University-related projects which began since January 2014:[24] "Plaintiff provides an email from July 28, 2014, indicating that she and Secolsky worked on a project for the Culturally Responsive Evaluation and Assessment (CREA) program at the University. The project was presented on September 18-20, 2014" (Court Order #306, p.4, 15-2136).[25]



---

[23] See #128, p.146; #132, p.32; & #148, p11 for Secolsky's verification of Park's two-week employment.
[24] See Appendix I. for Park's collaborative work with Secolsky regarding CREA conference at the University started from January 2014.

[25] See Appendix I. Evidence of Park and Secolsky's University-related work in 2014 for the two weeks.

Park provided evidence numerous times verifying that sexual harassment occurred concurrent to the context of the University.

Therefore, for res judicata or collateral estoppel to apply, this Court must prove that Park presented no evidence of harassment occurring in the context of the University.

**Fabrication #3:** This Court fabricated that "Secolsky eventually stopped the processing of Plaintiff's H1B visa because he felt Plaintiff was blackmailing him[,]"[26] which the Seventh Circuit also blindly followed.[27]

No evidence of Park blackmailing Secolsky exists, and no evidence was provided by Secolsky during the trial. Rather, Secolsky persistently offered Park a position at his company and offered to provide her with an H1B visa.[28]



do you still want to work for the non-profit company?

1 message

Charles Secolsky <csecolsky@gmail.com>          Tue, Jun 24, 2014 at 9:47 AM
To: Lisa Park <hpark15hpark@gmail.com>

---

[26] Court's Order #162, p.10, 15-2136

[27] See Order #74, p.4, 18-3017.

[28] Secolsky was required to file H1B visa application for Park to hire her.

Charles Secolsky <csecolsky@gmail.com>                    Tue, Jun 24, 2014 at 10:06 AM
To: Lisa Park <hpark15hpark@gmail.com>
Cc: Susan Henner <susan@sbhenner.com>

Hi Susan,

I have reached out to Lisa so that I can get a sense of the conditions of her employment with Resources in Education for
Urban Schools, Inc. but she has not yet responded back to me.

Charles Secolsky

---

Charles Secolsky <csecolsky@gmail.com>                    Tue, Jun 24, 2014 at 10:20 AM
To: Susan Henner <susan@sbhenner.com>
Cc: Lisa Park <hpark15hpark@gmail.com>

If Lisa responds appropriately and soon, I will continue to retain you. What is your deadline? If she does not respond to
my request regarding the legality of her perception of the work she is to perform, then hour many hours should I pay you
for? Is $900-$1,000 sufficient?

---

## I am still willing to renegotiate the H1-B Visa starting Tuesday - please contact as soon as you can.

3 messages

Charles Secolsky <csecolsky@gmail.com>                    Sun, Jun 29, 2014 at 10:50 PM
To: Lisa Park <hpark15hpark@gmail.com>

Susan was sent money and she must be informed to apply it to the H1-B visa application first thing in the morning before
she get to work.

---

Park did not want to work for Secolsky's company because of his ongoing sexual

harassment, therefore, she looked for a position elsewhere. However, her visa expiration date

was near and she needed to quickly find a position to continue staying in the country; Park

finally agreed to work part time on the condition that she "could work anywhere" and not at his

<u>place</u> as Park's email states:[29]

2:15-cv-02136-CSB-EIL  # 133-3

> From: Lisa Park <hpark15hpark@gmail.com>
> Date: Mon, Jun 30, 2014 at 5:03 PM
> Subject:
> To: Charles Secolsky <csecolsky@gmail.com>
>
>
> H-1 Sponsorship through My employment with Resources in Education for
> Urban Schools, Inc.
>
>
> A:
> Company→your non-profit organization is secure enough to hire me?
>
> B:
> Job description→ I talked to you (Chuck) " I only can do work related
> to a qualitative analysis." You said you would call me "Operations
> Research Analyst" with a payment $21.89 an hour.
> 20 * 21.89 = 437.8 * 52 weeks = $ 22,765.6 I am not a Statistician.
>
> C:
> Work site—> You told me I could work anywhere. I do not want to work
> at your place (your home address is your office address).
>
> D: 20 hours a week
> What if you not give 20 hours work that is related to my job
> description? I need a formal (official) contract. I ONLY want to do my
> job which describe in detail about job duty, hours, working site, etc.

Secolsky also felt the need to proclaim to his immigration lawyer that "She is not

extorting me. (…) Lisa has never wanted a relationship with me since we met. She loves her

husband. Exclusively. I agree to this statement[.]":

---

[29] See also employment contract "The Employee will work from home." (#133-4. 15-2136, emphasis
added).

2:15-cv-02136-CSB-EIL  Documents 1  cscolsky@gmail.com - Gmail  Page 1 of 2

E-FILED
Tuesday, 03 October, 2017  12:56:48 PM
Clerk, U.S. District Court, ILCD

Operations  Research Analyst

> Dear Susan,
>
>
>
> Lisa and I have come to an agreement:
>
> (1) if I keep my promises to submit employment papers and fees for
> H1-B Visa and pay you for initiating Green Card application (see
> Lisa's forwarded email below for stipulations).  She is not extorting
> me. We do not want a relationship with each other other than a
> professional relationship. Lisa has never wanted a relationship with
> me since we met. She loves her husband.
>
> exclusively. I agree to this statement and her statements below.
>
> She will work on assigned projects for 20 hours a week that are
> related
>
> to operations research analysis position related only qualitative analysis.
>
> I am attaching the letter from Rockland Community College. The IRS tax
> exempt form from the IRS will be forwarded shortly.
> ˅

Secolsky stopped processing Park's H1B visa not because he felt Park was blackmailing him, but in retaliation after learning about Park's complaints through ODEA. He states in his filing:[30]

"It's sad that she probably believed that I still wanted to associate with her. But, after Robert Stake had received word about the pornography incident and the diversity office at the University of Illinois had been informed of my psychiatrically incited inappropriateness, I no longer had any reason to have anything to do with Dr. Park so that was my reason for not notifying her about anything."

[30] #132, p.32. 15-2136, emphasis added.

As soon as Secolsky learned on August 4, 2014 that the University and Stake were informed of his misconduct, he emailed his immigration lawyer to stop all processing:

Charles Secolsky <csecolsky@gmail.com>                    Tue, Aug 5, 2014 at 4 08 PM
To  Susan Henner <susan@sbhenner.com>
Cc  Lisa Park <hpark15hpark@gmail.com>

Please hold offf on any processing until I speak to my attorney  NO PROCESSING AT ALL UNTIL I GIVE YOU
THE GREEN LIGHT
I'm very sorry
Charles Secolsky

Therefore, for res judicata or collateral estoppel to apply, this Court must prove that Park blackmailed Secolsky, thus, he "stopped the processing of Plaintiff's H1B visa."

**Fabrication #4:** This Court fabricated that "Park failed to demonstrate that the defendants denied her equal protection of the law because there was no evidence that they knew about Secolsky's sexual misconduct and facilitated or turned a blind eye to it[,]"[31] and ""Nothing Defendants did or did not do after June 21, 2014, caused Plaintiff to undergo harassment or made her liable or vulnerable to it."[32]

Nothing could be further from the truth. Although the evidence is overwhelming, only a handful are presented for convenience sake. First, "sexual harassment of students can be a form of sex discrimination covered by Title IX."[33] The Supreme Court held "Retaliation against a person because that person has complained of sex discrimination is another form of intentional

---

[31] The Seventh Circuit Order #74, p.4. 18-3017 (The Seventh Circuit summarized this Court order).

[32] Court Order #162, p. 51, 15-2136.

[33] See Appendix II b. Title IX, US Department of Education Office for Civil Rights (Title IX, p.3).

 sex discrimination"  (Jackson v. Birmingham Board of Education, 544 U.S. 167, at 174, emphasis added).



**Secolsky's Sex Discrimination**

1. Defendants acknowledged Park's allegations that Secolsky continued to inappropriately engage her: ODEA Reports state: "it has been determined that Respondent Secolsky, whom Complainant [Park] alleges continues to inappropriately engage her (…)"[34]

2. Defendants acknowledged Park's claims that "Secolsky called her multiple times to run errands, such as getting things from the pharmacy and clean his apartment, invited her to lunch, and left messages with no content. (#125, p.54 UMF ¶ 62, 15-2136)."

3. Defendants were notified of Secolsky's retaliation on August 6, 2014.[35]

4. In Hudson's meeting notes with Johnson, Hudson noted her thoughts about "disposing this case [Park's complaints] as soon as possible.[36]

---

[34] See Appendix I. Miscellaneous evidence for ODEA Report dated November 26, 2014.

[35] See Appendix I. Miscellaneous evidence for Park's notification of Secolsky's retaliation to Defendants.

[36] See Appendix I. Miscellaneous evidence for the meeting note.

5. ODEA Reports state: "Neither party has any affiliation with the University. Accordingly, ODEA has no jurisdiction over this matter[,]" and therefore, "No further action, by this office, is necessary at this time." [37]

6. Kaamilyah Abdullah-Span also stated in her email to the Associate Chancellor that ODEA did "not have jurisdiction to respond to Ms. Park's allegations[,]" therefore acknowledging Park's complaints over Secolsky's misconduct while turning a blind eye.[38]

7. Defendants' deliberate indifference to Secolsky's sexual harassment and retaliation after June 21, 2014, [39] caused Park to undergo harassment or made her liable or vulnerable to it.[40]

Therefore, for res judicata or collateral estoppel to apply, this Court must prove that there was no evidence that Defendants knew about Secolsky's misconduct and turned a blind eye to it.

**Fabrication #5:** This Court fabricated that Defendants "took what action they believed they could, due to Secolsky's nebulous connection with the University."[41].

In the previous fabrication, this Court ruled that there was no evidence that Defendants knew about Secolsky's sexual misconduct. Now, this Court ruled that Defendants took what

---

[37] See Appendix I. Miscellaneous evidence for ODEA Reports  dated October 17, 2014.

[38] See Appendix I. Evidence of Defendants' continuous denial of Park's status at UIUC for the email.

[39] See Appendix I. Evidence of Secolsky's continuous sexual harassment and retaliation after June 21, 2014.

[40] See Appendix I. Evidence of Park's psychological and physical injuries caused by Secolsky' misconduct. See also Appendix II. e. Additional Significant Medical Records.

[41] This Court's Order #162, p.50, 15-2136.

action they believed they could.

The fact is that Defendants violated University Policy and Federal law (Title IX) and failed to protect Park against sexual harassment and subsequent retaliation. To cover up their mistakes, Defendants schemed to revoke Park's status with the University and exclude her from their services.

Therefore, for res judicata or collateral estoppel to apply, this Court must prove that Defendants "took what action they believed they could" according to Title IX while following University Policy regarding Park's complaints.[42]

**Fabrication #6:** This Court fabricated that "Regarding Park's retaliation claims against the Board, the court found no casual connection between Park's complaints to ODEA and the termination of her Optional Practical Training status."[43] "The district court, therefore, properly concluded that Park failed to introduce sufficient evidence for a jury to find that the Board retaliated against her for complaining about sexual harassment."[44]

As stated in Park's filing with this Court, Park asserts that Defendants covered up their wrongdoings by excluding Park from their service:

"[Defendants] knew they did not follow their own procedures, which led to Secolsky's retaliation. They also knew that I was employed with my F1 student visa. Therefore, to cover up what they did wrong, they hoped that I would give up. However, I persistently challenged them. So, as retaliation, ODEA tried to get rid of me as soon as possible. (…)

---

[42] See Appendix II. A. Procedures listed on pp, 5-9 in Policy and Procedures for Addressing Discrimination and Harassment" at UIUC.

[43] The Seventh Circuit Order #74, p.4, 18-3017.

[44] The Seventh Circuit Order #74, p.6, 18-3017.

refused to protect me by denying my status at UIUC; (2) did not consider F1 OPT as a valid status[.]"[45]

After Defendants received Park's complaints, they refused to help her because they claimed that Secolsky had no affiliation with the University. Defendants then violated University Policy & Federal law, leading to Secolsky's retaliation. Park then carried out her statutorily protected activities by challenging Defendants' claims and actions, providing clear evidence. But for Park's statutorily protected activities, would Defendants have gone out of their way to illegally deny her status when they were informed of her OPT through valid sources?[46]

Seeing that Park wasn't going away, Defendants retaliated by conspiring to exclude her from their service. Denying her OPT as a valid status at the University was a means to an end. It is ironic for Defendants to argue that Park had no status while acknowledging her OPT as employment at the time of investigation.[47]

While Park desperately sought help, Defendants kept busy finding a way to legitimatize their exclusion of Park from their service as shown in Johnson's email to University Officials and Hudson's meeting note:[48]

---

[45]  Park's filing #293, pp.48-49, 15-2136.

[46] Among others, see Appendix I. Miscellaneous evidence for Director Misa's email to Hudson.

[47] See University MSJ #125, p.3, 15-2136.

[48] See Appendix I. Miscellaneous evidence for Hudson's meeting note.

**Johnson, Heidi**

| | |
|---|---|
| From: | Johnson, Heidi |
| Sent: | Tuesday, August 26, 2014 10:07 AM |
| To: | Hudson, Michal Thomas; Abdullah Span, Kaamilyah |
| Subject: | RE: Lisa Park update |

Do we have a statement from AHR stating that she is not considered an employee?

M.T. noted that while everyone sees Secolski's behavior as inappropriate, Park's behavior raises questions as well. M.T. let Heidi know my thoughts about disposing of this case as soon as possible.

Heidi noted to M.T. that she has explained our responsibilities to Park, and that neither she nor Secolski have any status on campus that would warrant an investigation by our office

Heidi said that she will follow up with Park and advise her of closure.

However, this Court did not consider Park's post-trial motion #293 as record and did not correct their fabrications.

Therefore, for res judicata or collateral estoppel to apply, this Court must prove there was no casual connection between Park's complaints and their exclusion of Park from their services via their denial of her OPT as a valid status.

**Fabrication #7:** This Court fabricated that Park "can cite only to her claim" regarding her claim of racial discrimination under equal protection against Secolsky.

The District Court stated: (#162, p.43, 15-2136, emphasis added).

"[Park] can cite **only to her claim** that Secolsky commented about "American culture," and that he, at some other times, stated that 'Asian women like white men' and nothing else. The citation to just one rather ambiguous comment, and another comment where nothing about the context of the comment is known."

However, Park cited multiple testimonies by Secolsky where he admitted to showing Park a pornographic video because "I thought that Korean girls, Asian women, liked white guys[,]"[49] and "The truth of the matter is that I told Park about it would teach her about American culture[.]"[50]

Secolsky also testified telling Park that his girlfriend in New Jersey liked "blowjobs" and "mutual oral sex."[51] He told Park that the reason he bragged of his sexual exploits was because "Asian women like white [guys]."[52]

Whether Park's report to the ODEA was based partly on racial discrimination was critical to the Jury's decision on her Count VII claim (Retaliatory Discharge) to the extent that the Jury foreperson asked the District Court Judge if he could "please clarify if the ODEA complaints were for racial discrimination accordance with Count VII[.]"[53]  The Judge, however, did not provide clarification which influenced the Jury's ultimate decision against Park regarding Count VII and affected the decisions of Park's other claims against Defendants.

Therefore, for res judicata or collateral estoppel to apply, this Court must prove that Park "can cite only to her claim" as to her claim of racial discrimination against Secolsky.

---

[49] Secolsky Dep., #128, pp. 114, 15-2136.

[50] Secolsky MSJ #138, p. 2, 15-2136.

[51] Secolsky Dep. #128, pp. 122-124.

[52] Park Dep. #125-1, p.153., 15-2136.

[53] #241, p. 4, 15-2136.  "Park need not prove the merits of her complaint to the ODEA, but only that she was acting under a reasonable, good faith belief that her right to be free from racial discrimination was violated."  (#240, p.34, 15-2136). See #309, pp.8-11, Case 15-2136 for details.

\*\*\*

For the foregoing evidence, this Court's prior rulings over Park's prior cases (Case Nos. 15-2136, 18-2090, & 19-2107) were founded on multiple fabrications and not on the merits; thus, neither res judicata nor collateral estoppel is applicable to Park's current case.

The Judge's actions in Park's prior cases were both unconstitutional and *ultra vires*. Such actions are beyond the scope or in excess of his legal power or authority. Therefore, the prior rulings are null and cannot affect the current case.

## Tolling Table of content

This Court advised Park not to litigate against the University and its officials when "Case No. 15-CV-2136 is still on appeal before the Seventh Circuit."[54] Therefore, Park waited for higher courts to review the issues with this Court's fabrications mentioned earlier. However, the Seventh Circuit did <u>not</u> second-guess the factual evaluation; once this Court decided what it considered factual, the decision was irrevocable in the higher courts and affected the judgments of the Seventh Circuit.

The final decision on Park's prior case was made by the Supreme Court on April 27, 2020. Therefore, the period of limitations shall be tolled until April 27, 2020, thus, Park files her current complaint against the University and its officials.

---

[54] #6, p.4, Case No. 19-CV-2107.

# IV. STATEMENT OF THE CASE AND FACTS Table of content

**Previous Rulings found** that Secolsky was liable for Park's following claims:

Count I (Battery), Count II (Assault), & Count V (False Imprisonment): Secolsky made unpermitted contact towards Park (Battery) and multiple attempts to grope and kiss her, causing her to fear immediate harmful or offensive contact (Assault). Secolsky also restrained Park's personal liberty or freedom of locomotion without her consent (False Imprisonment).

Count VI (Retaliation) & Count VIII (Intentional Infliction of Emotional Distress): Secolsky violated Park's civil rights under the Illinois Human Rights Acts by retaliating after learning about Park's complaints with the University. He then continued to sexually discriminate Park, intentionally inflicting emotional distress on his victim.

Count IX (Denial of Substantive Due Process): While acting under color of law, Secolsky deprived Park of her Fourteenth Amendment rights to equal protection as to her sexual harassment claim.[55]

**Background**. Lisa Park came to the US in 2000 with her five-year old son to pursue her dreams of being an international scholar. She built her life working persistently, with hopes of achieving her academic career goals. After conducting her five-year long dissertation project, she finally earned her Ph.D. at UIUC in August 2013.

---

[55] See Appendix I: Evidence of Secolsky's continuous sexual harassment and retaliation (Overview) and after June 21, 2014.

See Exhibit C. pp. 1-203, Case No. 18-cv-2090 for a detailed list of all the academic work Secolsky and Park had collaborated at the University.

Post-graduation, she decided to extend her research through a Post-Completion Optional Practical Training (OPT), which would allow her to work on her publications as a student-employee for one year, from October 1, 2013, to September 30, 2014, as well as an additional two-month grace period. Park's F1-OPT is indisputable by the US Citizenship and Immigration Services as shown in her I-20 below:[56]



Park is now a permanent resident of the United States.

During her time at the University, she became acquainted with Robert Stake, Professor Emeritus in the College of Education, Director of the Center for Instructional Research and Curriculum Evaluation ( hereinafter "CIRCE"), and Instructor for his EPSY 490E class.

Through Stake's class, Park met Charles Secolsky, a visiting researcher at CIRCE, in the fall of 2013. Seeing that they were in the same academic field, they began to collaborate on numerous academic activities and projects:[57]

---

[56] See Appendix I. Miscellaneous evidence. I-20 p. 3. See also #145-2, 15-2136 for I-20.

[57] See Appendix I. Evidence of Park and Secolsky's University-related work in 2014.

   "37. Plaintiff worked with Secolsky on grant proposals including American Educational Research Association (AERA) grant proposal [in Jan. 2014], a session at International Congress of Qualitative Inquiry (ICQI) conference at the University, a conference paper to the Center for Culturally Responsive Evaluation and Assessment (CREA) at the University [in Sept. 2014] and the Thailand Seminar Series at the University in [March & April 2014]."  (#212-1, uncontested facts p.4, 15-2136)

   Things were fine until Secolsky began to sexually harass Park in January 2014. Secolsky's harassment ranged from calling and leaving creepy voicemails over 10 times a day, to stalking her outside of her home.[58] Although Park initially suppressed her emotions, this grew over time to the point where she desperately needed help. To avoid conflict with Secolsky, Park first began to seek help outside of the University, meeting with a doctor followed by a psychiatrist.[59] However, they were not of much help and after months of continually enduring his sexual harassment, Park could endure no more.

   On June 21, 2014, Park found the courage to notify Stake at the advice of her psychiatrist "to which Stake rebuffed her efforts for him to take action because he did not believe that Secolsky was employed with the University of Illinois, and further indicated that he could not help (…) Accordingly, Stake took no action against Secolsky."[60]

   On June 24, Park visited the University's Women's Resources Center ("WRC"); they referred her to the Office of Diversity, Equity, and Access ("ODEA").

---

Park filed a detailed, two hundred and three-page long list of their University-related work from January 2014 to September 2014 numerous times to Defendants and before the District Court which includes the list in this Court's Order #162, 15-2136.  See also Exhibit C. pp. 1-203, Case No. 18-cv-2090 for a detailed list.

[58] See Appendix I: Evidence of Secolsky's continuous sexual harassment and retaliation (Overview).

[59] See Appendix II Additional Significant Medical Records.

[60] Stake filing #21, p.2, 15-2136.

On June 25, Park contacted ODEA regarding Stake and Secolsky's sexual harassment. When filling out her ODEA intake form, Park included discrimination on race and sex. This is because Secolsky told Park that he showed her a pornographic video because "I thought that Korean girls, Asian women, liked white guys[,]"[61] and "The truth of the matter is that I told Park about [sic] it would teach her about American culture[.]"[62] On a separate occasion, Secolsky told Park that his girlfriend in New Jersey liked "blowjobs" and "mutual oral sex".[63] He told Park that the reason he bragged of his sexual exploits was because "Asian women like white [guys]." Secolsky's racial remarks confirm that his sexual harassment involves discrimination on race/ethnicity as well as national origin. At that time, however, Park did not know that national origin discrimination applied to her. Park's intake form is as follows:

**OPTIONAL: Please provide the name, title/position, and contact information for any individual(s) involved:**

Charles Secolskycsecolsky@gmail.com   Staff Associate  Center for Instructional Research & Curriculum Evaluation (CIRCE)  csecolsky@gmail.com

Robert E. Stake Director Center for Instructional Research & Curriculum Evaluation (CIRCE)  stake@illinois.edu

**Indicate your reason(s) for contacting ODEA (check all that apply):**

*Inquiry* ☑   *Disability Accommodation Request* ☐   *Pay Equity* ☐   *Job Search Evaluation* ☐

*Discrimination on the Basis of:*  Race ☑   Sex ☐   Sexual Orientation ☐   Sexual Harassment ☑   Age ☐

Disability ☐   National Origin ☐   Race ☐   Religion ☐   Retaliation ☐

Other (please explain) _____

**Provide a brief description of your inquiry or complaint:**

I discussed my issue with Rachel from WRC. Sexual harassment/ Racial discrimination/Lies, distortion, & manipulation, slander

Seeking for the best way of getting through my situation and asking for advice (e.g. possible options that can be taken)

---

[61] Secolsky Dep., #128, pp. 114, 15-2136.

[62] Secolsky Dep., #138, p. 2, 15-2136.

[63] Secolsky Dep. #128, pp. 122-124.

On June 26, Park met Defendant Michal T. Hudson, Senior Title IX and ADA Specialist, at ODEA. Park brought documents[64] which included (1) Secolsky's activities as an instructor/researcher & program director; (2) Park's academic involvement with Secolsky at the University; (3) Secolsky's sexual misconduct; (4) Stake's sexual misconduct; (5) Park's visit to Carle Hospital for her physical and psychological damages caused by Stake and Secolsky's misconduct. Park also informed Hudson that she met Stake to address Secolsky's misconduct, but he refused to help. Hudson made a copy of the documents and assured Park that she would investigate the matter. After their first meeting, Park sent an email providing Hudson with her F1-OPT documents for future reference:



**RE: Follow-Up**
2 messages

**Lisa Park** <hpark15hpark@gmail.com>                    Thu, Jun 26, 2014 at 1:57 PM
To: Hudson Michal <mthdsn@illinois.edu>
Cc: Lisa Park <hpark15hpark@gmail.com>

Dear MT,

It was a productive meeting in that you might be able to suggest or take an action with regards to the issues I addressed. Thank you!

1.
I found the call history which is related to "porno incident" was on file. It was about Jan 23-24, about the time to submit the AERA grant proposal. I addressed my concerns with regards to the incident very seriously over the phone and in person.

2.
I also requested my medical report from Carle mental health Department. Dr. Traugott is my psychiatrist. I also request medical report from Acupuncture place. I might be able to updated them soon.

3. I forwarded the email that might be helpful to knows Chuck's affiliation with U of I.

4. I am a researcher with OPT with F1 visa. EAD card is here with a letter from Nancy.
Here is her information
Nancy Abelmann
Professor Anthropology
Associate Vice Chancellor for Research
The Harry E. Preble Professor of
East Asian Languages and Cultures
Asian American studies
Gender and Women's studies
Office of the Vice Chancellor for Research
418 Swanlund Administration Building,
601 East John St. M/C 304
Champaign, Illinois 61820
nabelman@illinois.edu
(217) 244-1867, (217) 333-6771

2 attachments

**A Letter from Nancy.jpeg**

---

[64] See Appendix I:  Miscellaneous evidence for Hudson's meeting note dated on June 26, 2014.

On July 1, 2014, Park met with Hudson to follow up. During their second meeting, Park informed her that, due to her visa expiration date approaching, she "agreed to be hired by Charles Secolsky"[65] the previous day (June 30) to continue staying in the US, advising Hudson to deal with her complaints cautiously.

Hudson then told Park that, because Secolsky had no affiliation with the University, ODEA wouldn't be of help other than asking the Education Department to discontinue consulting services with him. Park, again, displayed evidence showing his involvement with the University, which this Court acknowledged as uncontested facts:[66]

---

21. Defendant Charles Secolsky was a visiting researcher at the Center for Institutional Research and Curriculum Evaluation (CIRCE) at the University of Illinois from 2012 to 2014. (…)

25. Stake invited Secolsky to attend his case study class at that time.

26. Stake listed himself and Secolsky as the instructors in the EPSY 490E (Case Study Methods) class for 2014.

27. Stake further admits that Secolsky "substituted for" Stake in Stake's case study class, that he had Secolsky "take over, coordinating, helping" others, and that Secolsky "did present a topic from [Stake's] syllabus" in place of Stake.

28. Stake also allowed Secolsky to use files, books, copying facilities, and a desk in an office in the Children's Research Center.

29. While visiting CIRCE, Secolsky engaged in grant writing, teaching case study methods and program evaluation, paper presentations, lectures on survey research methodology, accreditation, evolution of validity, computerized adaptive testing, and Bayesian statistics in mixed method research.

30. Secolsky also advised and mentored doctoral students in Stake's case study classes.

31. Secolsky coordinated a visit by Thai students in the Spring of 2014.

---

[65] See Appendix I. Miscellaneous evidence for Hudson's meeting note entered on July 1, 2014.
[66] See Appendix I:  Evidence of Secolsky's activities at the University in 2012-2014.

(This Court filing #212-1,Uncontested facts p.3-4, 15-2136).

Strangely, Hudson firmly reiterated that Secolsky was not affiliated with the University although, according to University Policy, Secolsky was considered an employee:

A. **Terminology:**
   1. Employee is any individual who performs services for the campus or the University in exchange for pay, benefits, or University affiliate status, including but not limited to: tenure and tenure track faculty, adjunct faculty, lecturers, instructors, teaching associates, academic professionals, visiting academic professionals, civil service personnel, extra-help personnel, academic hourly personnel, graduate assistants, pre and postdoctoral fellows, and undergraduate and graduate hourly students.

p.10

Further, Title IX covers sexual harassment and retaliation conducted even by a non-employee third party:

"Title IX protects any "person" from sex discrimination. Accordingly, both male and female students are protected from sexual harassment10 engaged in by a school's employees, other students, or third parties." (Title IX, p.3) and "sexually harassing conduct by third parties, who are not themselves employees or students at the school (e.g., a visiting speaker or members of a visiting athletic team), may also be of a sufficiently serious nature to deny or limit a student's ability to participate in or benefit from the education program." (id., p.12).

As Title IX coordinators, Defendants "must have knowledge of the requirements of Title IX, of the school's own policies and procedures on sex discrimination, and of all complaints raising Title IX issues throughout the school."[67]

---

[67] "Questions and Answers on Title IX and Sexual Violence, US Department of Education Office for Civil Rights," p.10-11, emphasis added. ( hereinafter "Title IX Q&A").

Park did not want ODEA to ask the Department to cut ties with Secolsky in fear of revenge, so she declined. However, Secolsky's harassment continued, including telephone harassment and leaving creepy voicemails; attempts to lure her to his apartment under various reasons; attempts to grope and kiss Park; and stalking her outside of her home.

Secolsky admitted, "I went to her apartment[.] I did phone Park from my car and when she did not answer and I noticed her car parked in front of her apartment building, I decided to ring her buzzer, called her name from the street, and knocked on the front door of her building."[68]

Additionally, Secolsky admitted he told Park he "wants children, and asked Park if she can still have children" (Secolsky's filing #132, p.20, 15-2136). He also asked Park to marry him several times over the summer of 2014 and, upon questioning, confessed he had been upset because Park rejected him.[69]

Secolsky's unsettling harassment caused Park enormous distress[70] and she could no longer endure this way of life.[71]

On July 9 and July 14, Park again asked Hudson what further assistance ODEA could provide aside from the Department firing Secolsky.

On July 16, Hudson again responded that because Secolsky had no status, she could do nothing more than ask the Department to cut ties with him. Park again responded that she did not want further assistance if that was all they could do, as she did not want Secolsky and Stake to

---

[68] Secolsky's filing #302, p.6, 15-2136.

[69] See #293, p.14, 15-2136 for the transcript of the recording.

[70] See Appendix I. Evidence of Park's psychological and physical injuries.  See also Appendix II. e. Additional Significant Medical Records.

[71] See Appendix I: Evidence of Secolsky's continuous sexual harassment and retaliation after June 21, 2014.

retaliate, destroying her hard work and risking her legal status. Hudson then extended her best wishes to Park regarding her future endeavors before stating, "Nevertheless, I still have an obligation [to investigate] as it relates to inappropriate conduct on this campus."[72]

On July 17, dissatisfied, Park went back to ODEA to meet Hudson's supervisor, but the office clerk denied her access to the office while Hudson actively hid from her.[73] The clerk informed Park that she could only meet with Hudson and that Hudson would contact her. She did not hear back from them for weeks.

Park immediately started searching for help elsewhere; she went to the University Police Department which did nothing but redirect her back to the University. She then sought help from the University's Human Resources (HR) regarding not only Secolsky's sexual misconducts but ODEA's deliberate indifference as well.

On July 23, Park met Yulee Kim,[74] Employee Relations Coordinator at HR, and although Park explained that ODEA would not help her, Kim could only redirect her back to ODEA.

On July 30, desperate to seek help, Park met Kim again. Kim again urged her to go to ODEA as there was nothing HR could do. If Park were to get any sort of help, it would only be through ODEA. With no other choice, Park again emailed Hudson to see if anything had changed since her last visit; she received no response.

---

[72] See Appendix I: Miscellaneous evidence  for Hudson's email to Park on July 16, 2014. Emphasis added.

[73] See Appendix I: Miscellaneous evidence for Hudson's knowledge of Park's visit on July 17, 2014 through the clerk.

[74] See Appendix I: Miscellaneous evidence for Park's condition during her deposition.

| From: | hpark15hpark@gmail.com on behalf of Lisa Park <hpark15@illinois.edu> |
|---|---|
| Sent: | Wednesday, July 30, 2014 5:08 PM |
| To: | Hudson, Michal Thomas |
| Cc: | hpark15 |
| Subject: | Re: Follow-Up from Lisa - update/schedule/conclusion |

Dear MT,

Hope this email finds you well.

Now I feel I know much more about how to cope with Dr. Secolsky although my psychiatrist advised me to continue to take medication today.

Now, I wonder if there is anything your office can do about the difficulties I have gone through due to the issues I have raised, as you know. Or is there anything your office might recommend or advise me? I think my issue is related to the negligence of the University of Illinois.

On that same day, Felicia Parks, a representative from HR, reached out to Hudson after learning about Park's situation:

| From: | Microsoft Outlook on behalf of Parks, Felicia A |
|---|---|
| Sent: | Wednesday, July 30, 2014 9:08 AM |
| To: | Hudson, Michal Thomas |
| Subject: | Missed call from Parks, Felicia A |

**You missed a call from Parks, Felicia A at fparks@illinois.edu**

| Caller-Id: | fparks@illinois.edu |
|---|---|
| Job Title: | HUMAN RESOURCE REPRESENTATIVE |
| Work: | + 1 217 333 0033 |
| E-mail: | fparks@illinois.edu |
| IM Address: | fparks@illinois.edu |

As qualified employees, Defendants must be well versed in the University's Policy and Procedures for Addressing Discrimination and Harassment, which states that ODEA must first receive an "Informal Resolution Request Form" (IRRF)[75] signed by the victim, which would then lead to meeting with and discussing "what outcome or remedy she is seeking" as listed on

---

[75] See Appendix II for the Policy p. 6 and Appendix I: Miscellaneous evidence for IRRF.

the form before moving forward. However, Defendants must have been under the impression that the rules did not apply to them. Park did not submit nor sign an IRRF, nor did she hear back from ODEA to discuss possible solutions and get Park's consent.

On August 4, 2014, without informing or responding back to Park, Hudson met with Stake once. Later that day, Park received phone calls from Secolsky addressing Stake's meeting with Hudson.

On August 5, Hudson then met with Secolsky once, and informed him about Park's complaints. This is a serious violation of University Policy.

In her deposition, Hudson stated that she could not tell if Stake was telling the truth when he told her that he had no recollection of kissing Park.[76] She also stated, "everyone sees Sokolski's [sic] behavior as inappropriate[.]"[77] Nevertheless, ODEA then stopped their sham investigation and brushed it under the rug.

According to Title IX, Defendants must "not only take steps to prevent retaliation but also take strong responsive action if it occurs. This includes retaliatory actions taken by the school and school officials." (Title IX Q&A p. 19).[78] "Title IX requires the school to protect the complainant and ensure his or her safety as necessary." (Id., p. 20).

ODEA's reckless intervention not only failed to uphold Title IX, it made matters much worse. After Secolsky learned about Park's complaints, he began to retaliate against Park in

---

[76] Hudson Dep. #133-1, p.32, 15-2136.

[77] See Appendix I: Miscellaneous evidence for the meeting note.

[78] "Questions and Answers on Title IX and Sexual Violence, US Department of Education Office for Civil Rights" ( hereinafter "Title IX Q&A").

numerous ways.                                                    Table of content

On August 5, that same day, Secolsky abruptly emailed his immigration lawyer, Susan

Henner, to stop processing Park's visa:

| | |
|---|---|
| **Charles Secolsky** <csecolsky@gmail.com> | Tue, Aug 5, 2014 at 4:08 PM |
| To: Susan Henner <susan@sbhenner.com> | |
| Cc: Lisa Park <hpark15park@gmail.com> | |

    Please hold off on any processing until I speak to my attorney. NO PROCESSING AT ALL UNTIL I GIVE YOU
THE GREEN LIGHT.
I'm very sorry.
Charles Secolsky

Secolsky also retaliated by excluding Park from all their collaborated academic work[79]

among other methods.

Secolsky later stated in his filing that, "after Robert Stake had received word about the

pornography incident and the diversity office at the University of Illinois had been informed of

my psychiatrically incited inappropriateness, I no longer had any reason to have anything to do

with Dr. Park (…)":[80]

"It's sad that she probably believed that I still wanted to associate with her. But
after Robert Stake had received word about the pornography incident and the
diversity office at the University of Illinois had been informed of my
psychiatrically incited inappropriateness, **I no longer had any reason to have
anything to do with Dr. Park so that was my reason for not notifying her
about anything.**"

---

[79] See Exhibit C. pp. 1-203, Case No. 18-cv-2090 for a detailed list.

[80] #132, p.32. 15-2136, emphasis added.

On August 6 and August 7, Park, bewildered and distressed, emailed Hudson again, alerting her of Secolsky's retaliation.[81]

On August 7, Hudson finally responded to Park after weeks of neglect. In her response, Defendants, for the first time, denied Park's status at the University:

---

**Hudson, Michal Thomas** <mthdsn@illinois.edu>     Thu, Aug 7, 2014 at 9:22 PM
To: Lisa Park <hpark15hpark@gmail.com>

Hello Ms. Park –

I have met with Dr. Robert Stake, and my understanding is that neither you nor Mr. Secolsky have any direct employment or **current** affiliation with the University of Illinois. If you have information to the contrary please let me know.

---

To recap, after being sexually harassed by University professor Stake and his teaching assistant Secolsky, Park met with Hudson of the ODEA and filed a complaint. Hudson was provided with documentation of 1) Secolsky's affiliation with the University, 2) Park & Secolsky's academic collaboration, 3) Secolsky's sexual misconduct, and 4) Park's medical records regarding the physical and psychological trauma caused by Secolsky.

When the only option Hudson provided involved terminating Secolsky's services, Park declined and requested no further assistance to avoid conflict and retaliation. Nevertheless, Hudson stated that she has an obligation to follow up as it relates to inappropriate conduct within the University. Park then sought help from the University Police and HR several times only to be redirected to ODEA on all occasions. HR then contacted ODEA.

Without informing or responding to Park and without a signed IRRF, Hudson recklessly

---

[81] See Appendix I. Miscellaneous evidence for Park's notification of Secolsky's retaliation to Defendants.

met Stake and Secolsky once before dropping the investigation completely. Secolsky began to retaliate and Park alerted ODEA.

Defendants violated University policy, failed to enforce Title IX, and jeopardized Park.

To cover up their reckless wrongdoings, Defendants began to retaliate as well, excluding Park from their services by denying her affiliation with the University.

**ODEA's Retaliation.** Park sent multiple emails challenging Defendants' claims, repeatedly providing proof of status.

On August 13, Hudson responded with subject line "RE: Reminder Clarification/Final:"[82]

On August 13, Hudson responded with subject line "RE: Reminder Clarification/**Final:**"

"As I stated earlier, the information I have been able to glean indicates that neither you nor Mr. Secolsky are employed or currently affiliated with the University. The onus, therefore, would be on you to demonstrate otherwise. Accordingly, and unless you can demonstrate that the inappropriate behavior occurred while you were either employed by or were a student at the University, this office has no jurisdiction over your matter." (emphasis added).

Park again challenged Hudson regarding her "final" email with 10 documents showing proof of status:

---

[82] See Appendix I: Miscellaneous evidence for the final email.



Defendants went from originally stating their obligation to follow up on Park's complaints as it relates to inappropriate conduct within the University, to stating that their office has no jurisdiction over her matter. Defendants never addressed Park's documents and stopped responding altogether.

On August 14, Park contacted Julie Misa, Director of the International Student and Scholar Services. Upon Park's request, Julie verified Park's OPT to Defendants.

From:           Misa, Julie B
Sent:           Thursday, August 14, 2014 12:29 PM
To:             Hudson, Michal Thomas
Cc:             hpark15
Subject:        Lisa Park update

Dear Michal,

I am writing to you to at Lisa (Hye Young) Park's request with information about her status. Lisa is currently in F-1 nonimmigrant status through the University of Illinois, Urbana-Champaign. She is authorized for one year of post-completion Optional Practical Training (OPT) based on having finished her doctoral degree here. I understand that she has been working with Professor Nancy Abelmann during her OPT, but on an unpaid basis. Unpaid activities are allowed during OPT, as long as those activities are directly related to the student's field of study.

Please be in touch if I can provide any additional information.

Sincerely,

Julie Misa, Director
International Student and Scholar Services

On August 15, Park received a surprising email from her adviser, Nancy Abelmann, who suddenly decided to withdraw her OPT sponsorship.

Abelmann, Nancy A <nabelman@illinois.edu>                Fri, Aug 15, 2014 at 5:25 PM
To: Lisa Park <hpark15hpark@gmail.com>

I am no longer willing to support your OPT because I am technically on academic leave. If al lawyer gives me a template for a green card I will be happy to submit a letter.

I hope you are well,

Nancy

Sent from my iPhone

On August 18, Defendants spoke with Julie Misa. Julie followed up with an email pointing out that "some of these [documents] show very recent activity out of CIRCE." Takeaway points from the conversation included acknowledgement of Park's F1-OPT status and "potentially scheduling a meeting with Julie and legal to discuss what next steps might be."

From: Misa, Julie B
Sent: Monday, August 18, 2014 11:23 AM
To: Hudson, Michal Thomas <mthdsn@illinois.edu>
Subject: FW: 10:30 pm meeting

Dear MT,

Here are the documents I was referring to in our phone conversation. Some of these show very recent activity out of CIRCE.

Kind regards,
Julie

Julie Misa, Director
International Student and Scholar Services
University of Illinois at Urbana-Champaign
400 Student Services Building
610 E. John
Champaign, IL 61820
(217) 333-1303 - phone  (217) 244-0530 - fax
jmisa@illinois.edu   http://isss.illinois.edu/

---

**Unknown**

| | |
|---|---|
| Subject: | Misa conversation |
| Location: | M.T.'s Office |
| Start: | Mon 8/18/2014 11:00 AM |
| End: | Mon 8/18/2014 11:30 AM |
| Recurrence: | (none) |
| Organizer: | Hudson, Michal Thomas |

M.T. spoke with Julie Misa. The following are points of take away:
- ✓ Park attended a CIRCE Thailand Seminar in April 2014.
- ✓ Still on University of Illinois campus
- ✓ Immigration (F1) status
- ✓ One year practical training   (Organizing Workshop)
- ✓ Arangement with Nancy Ablemann > Volunteer basis > could be paid activity 20-24 hours > using the U. of I. as employer.
- ✓ Steve Anderson/legal
- ✓ (Working on a volunteer basis, but using the U of I as employer.
- ✓ Policy statement regarding Labor Law
- ✓ M.T. mentioned potentially scheduling a meeting with Julie and legal to discuss what next steps might be.

On August 26, Defendant Heidi Johnson (Director of ODEA) asked Defendant

Kaamilyah Abdullah-Span (Associate Director) and Hudson if they have proof that Park is not

considered an employee:[83]

---

[83] See Appendix I: Evidence showing Kaamilyah Abdullah-Span and Menah Pratt-Clarke's deep involvement in the case from the beginning along with M.T. Hudson and Heidi Johnson.

---

**Johnson, Heidi**

| | |
|---|---|
| **From:** | Johnson, Heidi |
| **Sent:** | Tuesday, August 26, 2014 10:07 AM |
| **To:** | Hudson, Michal Thomas; Abdullah-Span, Kaamilyah |
| **Subject:** | RE: Lisa Park update |

Do we have a statement from AHR stating that she is not considered an employee?

---

On October 1, 2014, Park finally met Johnson who, again, firmly stated that Park had no status and that there was nothing they could do. Park followed up with eleven emails with the same proof she had constantly been sending only to have her cries fall on deaf ears.[84]

On October 13, Hudson and Johnson met privately. In Hudson's meeting notes, she "let Heidi know my (M.T.) thoughts about disposing of this case as soon as possible." In addition, Johnson reassured Hudson that "neither she nor Secolsky have any status on campus that would warrant an investigation by our office."[85]

---

M.T. noted that while everyone sees Secolski's behavior as inappropriate, Park's behavior raises questions as well. M.T. let Heidi know my thoughts about disposing of this case as soon as possible.

Heidi noted to M.T. that she has explained our responsibilities to Park, and that neither she nor Secolski have any status on campus that would warrant an investigation by our office.

Heidi said that she will follow up with Park and advise her of closure.

---

[84] See Appendix I: Evidence of Defendants' continuous denial of Park's status at the University.

[85] See Appendix I: Michelleous evidence for the meeting note.

The evidence is overwhelmingly clear that Defendants knew about Park's OPT status, validated by reliable sources. But for Park's statutorily protected activities, challenging their false claims, would Defendants have gone out of their way to illegally deny her status?

Seeing that Park wasn't going away, Defendants retaliated by conspiring to exclude her from their service. Denying her OPT as a valid status was a means to an end.[86]

Meanwhile, Secolsky continued to 1) teach EPSY 490E as an instructor, 2) interact with students and scholars at UIUC, and 3) work on activities under CIRCE. Secolsky's harassment and retaliation also continued, inflicting severe physical and psychological injury to Park to the point that she subsequently suffered PTSD-induced panic attacks and excruciating chest pain, which led to a heart attack. She immediately rushed to a hospital and was directly sent to the emergency room.[87] Defendants' inexcusable negligence and failure to help Park not only ruined her career, they put her life at risk.

> **HPI:** Pt is a 46 year old year old female presenting to Carle emergency department today c/o chest pain and anterior neck discomfort. Pt describes the pain as moderate, pressure and tightness and at times burning pain, radiation to throat at times with a bad taste in her mouth, aggravated by anxiety symptoms, alleviated by nothing. Onset of symptoms was January of this year after alleged sexual harassment at work. Pt with a lot of stress and has flash backs to the harassment. She notes feeling palpitations and anxiety almost every day for the past 3 weeks now.

On October 21, Defendants provided a one-page Informal Resolution Disposition Report which contained multiple non-factual statements.

---

[86] In Park's original lawsuit, Defendants ironically argued that Park had no status at the time of investigation while acknowledging her OPT as employment. See #125, p.3, 15-2136.

[87] See Appendix I. Evidence of Park's psychological and physical injuries for Park's near-fatal injury.

Their report falsely claimed that Park submitted an Informal Resolution Request and she

had an H1 Visa.

On June 26, 2014, Hye Young (Lisa) Park (Complainant), submitted an Informal Resolution request to the Office of Diversity, Equity, and Access (ODEA).

Complainant alleged that her international student status, with an H1 Visa, required that the Visa be renewed in order for her to remain in the United States and continue her research.

Defendants concluded that:

"Per the information provided by both Complainant and the Respondents and after further review, it was determined that neither party has any affiliation with the University. Accordingly, ODEA has no jurisdiction over the matter. The matter brought forth by the Complainant remains unresolved. This dispositional report is a clarification of the issues pursuant to the complaint received by ODEA. No further action, by this office, is necessary at this time."[88]

On October 22, Park challenged Johnson again; she attached a word document criticizing

ODEA and their fabrications in the Informal Resolution Disposition:

"At this time of writing, I have several questions:

1. On what basis, did you write the report? Would you substantiate what I pointed out "not right"?

2. You mentioned that I was neither employed by and nor affiliated with U of I at the time of the incidents that I have complained. What is your position in this matter?

3. Did I submit the informal resolution officially? Did I fill out the form to allow the informal resolution?

4. I showed the evidences that Secolsky has been involved in U of I activities including acting instructor on Stake's behalf at least until September 2014. I also showed the evidences that Stake gave Secolsky a permission to use visiting scholar and visiting professor at CIRCE at the U of I. While numerous evidences have been staring right in

---

[88] See Appendix I: Miscellaneous evidence for ODEA's disposition dated October 17, 2014.

> front of your face, how can you support your allegation that Secolsky "has no exiting affiliation or formal interaction with the University. I believe that the statement clearly shows you negligence and lack of accountability. What would you say about it?"
>
> (Attached word document in Park's email to Johnson dated on Oct.22, 2014).

Defendants never addressed any of Park's issues.

With Park fully taken care of, Defendants moved on to tie up loose ends.

On October 31, Defendants met with the Dean of the College of Education to discuss the matter of Stake giving Secolsky permission to use the title of 'Professor, visiting CIRCE, Illinois' at UIUC. They did not discuss either party's sexual harassment or retaliation.[89]

From: Hudson, Michal Thomas
Sent: Friday, October 31, 2014 11:31 AM
To: Abdullah-Span, Kaamilyah
Cc: Johnson, Heidi
Subject: PARK
Importance: High

Great Morning Kaamilyah –

Heidi and I just met with the College of Education regarding the above subject matter.
Dean Mary Kalantzis is interested in getting letters out to Stake and Secolsky today, if possible. She has asked us to provide verbiage for the letters.

The letter to Stake should address the inappropriate action, per an e-mail of April 30, 2014 (see attached) giving Secolsky          permission to use the title of 'Professor, visiting CIRCE, Illinois' in affiliation with the University of Illinois, when he in fact has no affiliation with the University.

The letter to Secolsky should address the illegality of him feigning an affiliation with the University, and if possible noting that charges could be brought against him.  I am also attaching a LinkedIn pdf of August 19, 2014, where Secolsky uses the title of Staff Associate with the University of Illinois at Urbana-Champaign.
In totality, the letters should include verbiage to cease and desist using the University of Illinois name. Any verbiage assistance/guidance you can offer will be appreciated.

---

[89] See also Appendix I. Miscellaneous evidence for Cease-and-desist letter to Secolsky  dated November 17, 2014.

A battered and worn out Park persisted; she continued to send emails to Johnson, crying for justice with what little energy she had left. Park contacted ODEA more than 60 times throughout this ordeal, challenging (1) their conclusion that Park had no status; (2) their conclusion that Secolsky had no status; (3) their violation of University Policy and Federal law; (4) their deliberate indifference to Park's complaints about Secolsky's sexual harassment and retaliation; & (5) their deliberate indifference to Stake's indifference of Park's continuous complaints.[90]

Finally, on December 4, Johnson sent another a one-page Informal Resolution Disposition Report. In this new report, Defendants solely and heartlessly retracted their initial claim that "Complainant [Park] submitted an Informal Resolution request" and replaced it with "Park (Complainant), met with the Office of Diversity, Equity, and Access (ODEA)."[91]

Not only did their inexcusable negligence and failure to help Park destroy everything she had worked for, the inhumane actions and cruelty of Defendants Menah Pratt-Clarke, Heidi Johnson, Kaamilyah Abdullah-Span, and Michal T. Hudson jeopardized Lisa Park's very life.[92]

Jose Ochoa, MD from the Emergency Department wrote "Pt with a lot of stress and has flashbacks to the harassment." He continued to state "she may die if not fully evaluated."

---

[90] See #s 133-5 and 133-6, 15-2136 for examples.

[91] See Appendix I: Miscellaneous evidence for ODEA's disposition dated November 26, 2014.

[92] See Appendix I. Evidence of Park's psychological and physical injuries for the note. See also Appendix II. e. Additional Significant Medical Records.

# VI.    POLICY AND LAW Table of content

Relating to sexual harassment and retaliation at the University, Park mainly utilizes three documents effective as of 2014: (1) "Policy and Procedures for Addressing Discrimination and Harassment at the University of Illinois, Urbana-Champaign" (**University Policy**); (2) "Questions and Answers on Title IX and Sexual Violence, US Department of Education Office for Civil Rights" (**Title IX Q&A**);[93] and (3) "Revised Sexual Harassment Guidance: Harassment of Students By School Employees, Other Students, or Third Parties, Title IX, US Department of Education Office for Civil Rights" (**Title IX**).[94]

**Responsibility.** As an institution receiving federal financial assistance (hereinafter "recipient institution"), the University of Illinois at Urbana-Champaign (Illinois) is

> "committed to providing prompt and effective resolution of alleged or suspected incidents of discrimination and harassment" and "discipline will be imposed in accordance with applicable University statues and relevant University rules and regulations. Retaliation against any person for coming forward with a complaint or a concern, or for otherwise participating in this process, will not be tolerated." (University Policy, p.1, emphasis added).

University Policy complies with multiple laws that prohibit discrimination and harassment (Id., p.1):

---

[93] Although this document (Title IX Q&A) "focuses on sexual violence, the legal principles apply to other forms of sexual harassment. Schools should ensure that any training they provide on Title IX and sexual violence also covers other forms of sexual harassment. Postsecondary institutions should also be aware of training requirements imposed under the Clery Act." ( Title IX Q&A p.38 footnote, emphasis added).

[94] See Appendix II for the documents.

A. **Overview of Prohibited Acts**

Illinois is committed to ensuring that its learning and working environments are free from all forms of discrimination and harassment.

This policy is designed to promote a safe and healthy learning and work environment and to comply with multiple laws that prohibit discrimination, including: Title VI of the Civil Rights Act of 1964, Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act Amendments Act, the Rehabilitation Act of 1973, the Age Discrimination in Employment Act of 1967, the Age Discrimination Act, Title IX of the Education Amendments Act of 1972, the Pregnancy Discrimination Act of 1978, the Uniformed Services Employment and Re-employment Act, the Veterans' Readjustment Act of 1974, the Genetic Information Nondiscrimination Act of 2008, and the Illinois Human Rights Act.

The University must take immediate actions to end any harassment and discrimination:

"Once a school has notice of possible sexual harassment of students — whether carried out by employees, other students, or third parties — it should take immediate and appropriate steps to investigate or otherwise determine what occurred and take prompt and effective steps reasonably calculated to end any harassment, eliminate a hostile environment if one has been created, and prevent harassment from occurring again. These steps are the school's responsibility whether or not the student who was harassed makes a complaint or otherwise asks the school to take action." (Title IX, p.15, emphasis added).

According to University Policy, Defendants Hudson, Johnson, Abdullah-Span of the ODEA and Pratt-Clarke (Associate Chancellor, Associate Provost for Diversity) are ultimately responsible for Stake and Secolsky's sexual harassment and retaliation:

| ODEA's Responsibility (Hudson, Johnson, and Abdullah-Span) |
|---|
| IV.   **TITLE IX REPORTING AND PROCEDURES**<br>A.   **Role of the Lead Title IX Coordinator and Contact Information**<br>The Lead Title IX Coordinator is responsible for overseeing all of Illinois' Title IX compliance efforts, including gender discrimination, sexual harassment, retaliation, sexual assault, and athletics. The Title IX Coordinator coordinates Illinois' efforts to end the alleged discrimination, prevent its recurrence, and remedy its effects on the victim and the Illinois community.<br><br>The Lead Title IX Coordinator can be reached by contacting the Office of Diversity, Equity, and Access via email at: diversity@illinois.edu, via telephone at (217) 333-0885, or in person by visiting 100 Swanlund Administration Building; 601 E. John Street; Champaign, IL 61820.<br><div align="right">p. 9</div> |

| Associate Chancellor' Responsibility (Pratt-Clarke) |
|---|
| B.   **Administrative Responsibility:** The Associate Chancellor will serve as the Lead Title IX Coordinator in the operation of these procedures. To assure consistent assessment and handling of complaints, the Associate Chancellor will have the lead responsibility for overseeing all aspects of this policy. Vice chancellors, deans, directors and department heads will share the responsibility for the effective functioning of these procedures within their units, subject to oversight by the Office of Diversity, Equity, and Access.<br><div align="right">p.11</div> |

In addition, Defendants must first receive an "Informal Resolution Request Form" (IRRF) signed by Park, which would then lead to meeting with Park and discussing "what outcome or remedy she is seeking" listed on the form before moving forward. See Appendix II. University Policy, p.6, and see Appendix p. for IRRF.

As a recipient institution, Defendants "must have knowledge of the requirements of Title IX, of the school's own policies and procedures on sex discrimination, and of all complaints raising Title IX issues throughout the school." ( Title IX Q&A, p.10-11, emphasis added). They are also obligated to ensure that "school employees are aware of their Title IX obligations under such state and local laws and the consequences for failing to satisfy those obligations." (id., p.3).

**Title IX Coverage for Park.** Title IX of the Education Amendments of 1972 ("Title IX") is a federal civil rights law that "provides an avenue of legal relief for victims of <u>sexual abuse and harassment</u> at educational institutions. It bars discrimination 'on the basis of sex' in an educational program or activity receiving federal funding" and "Title IX is mainly enforced (1) through private rights of action brought directly against schools by or on behalf of students subjected to <u>sexual misconduct</u>; and (2) by federal agencies that provide funding to educational programs."[95]

Sexual misconduct and harassment are forms of sex discrimination when the conduct is based on an individual's sex or gender:

> "Sexual misconduct includes, but is not limited to: <u>intentional and undesired physical contact, stalking, attempted or actual kissing</u> or fondling, intimate partner violence, coerced sexual activity, indecent exposure, <u>repeated unsolicited propositions for dates and/or  sexual relations,  and any other conduct of a sexual nature that is nonconsensual, or has the purpose or effect of threatening, intimidating, or coercing (physically or psychologically) a person or persons.</u> (...) Title IX also prohibits gender-based harassment, which includes acts of verbal, nonverbal, or physical aggression, intimidation, or hostility based on sex or sex-stereotyping, <u>even if those acts do not involve conduct of a sexual nature</u>"
> (University Policy, p.3, emphasis added).

Title IX acknowledges that "Sexual harassment of a student can deny or limit, on the basis of sex, the student's ability to participate in or to receive benefits, services, or opportunities in the school's program." (Title IX, p.2). Therefore, it protects:

---

[95] https://fas.org/sgp/crs/misc/R45685.pdf  Title IX and Sexual Harassment: Private Rights of Action, Administrative Enforcement, and Proposed Regulations, emphasis added.

"students from other forms of sexual harassment (including sexual violence and sexual abuse), such as sexual harassment carried out by school employees. Sexual harassment by school employees can include unwelcome sexual advances; requests for sexual favors; and other verbal, nonverbal, or physical conduct of a sexual nature, including but not limited to sexual activity" and "nonsexual conduct may take on sexual connotations and rise to the level of sexual harassment. For example, a teacher repeatedly hugging and putting his or her arms around students under inappropriate circumstances could create a hostile environment."(Title IX Q&A, pp.3-4).

Title IX also covers retaliation; a recipient institution and its employees are "prohibited from retaliating (including intimidating, threatening, coercing, or in any way discriminating against the individual) because of the individual's complaint or participation." (Title IX Q&A, pp.42-43).

After Park came forward with her complaints against Secolsky's discrimination based on sex and race, Defendants responded by being deliberately indifferent and violating University Policy and Title IX. When Park challenged Defendants' misconducts, they retaliated by excluding her from the University, again, violating Title IX and engaging in discrimination based on sex and race as well.

**K-1. Does Title IX protect against retaliation?**

**Answer:** Yes. The Federal civil rights laws, including Title IX, make it unlawful to retaliate against an individual for the purpose of interfering with any right or privilege secured by these laws. This means that if an individual brings concerns about possible civil rights problems to a school's attention, including publicly opposing sexual violence or filing a sexual violence complaint with the school or any State or Federal agency, it is unlawful for the school to retaliate against that individual for doing so. It is also unlawful to retaliate against an individual because he or she testified, or participated in any manner, in an OCR or school's investigation or proceeding. Therefore, if a student, parent, teacher, coach, or other individual complains formally or informally about sexual violence or participates in an OCR or school's investigation or proceedings related to sexual violence, the school is prohibited from retaliating (including intimidating, threatening, coercing, or in any way

Page 42 – Questions and Answers on Title IX and Sexual Violence

discriminating against the individual) because of the individual's complaint or participation.

A school should take steps to prevent retaliation against a student who filed a complaint either on his or her own behalf or on behalf of another student, or against those who provided information as witnesses.

Schools should be aware that complaints of sexual violence may be followed by retaliation against the complainant or witnesses by the alleged perpetrator or his or her associates. When a school knows or reasonably should know of possible retaliation by other students or third parties, it must take immediate and appropriate steps to investigate or otherwise determine what occurred. Title IX requires the school to protect the complainant and

(IX Q&A, pp. 42-43, emphasis added)[96]

---

[96] As discussed earlier, although "this document focuses on sexual violence, the legal principles apply to other forms of sexual harassment." (Title IX Q&A p.38 footnote, emphasis added).

Finally, a school should take steps to prevent any further harassment[94] and to prevent any retaliation against the student who made the complaint (or was the subject of the harassment), against the person who filed a complaint on behalf of a student, or against those who provided information as witnesses.[95]  At a minimum, this includes making sure that the harassed students and their parents know how to report any subsequent problems and making follow-up inquiries to see if there have been any new incidents or any retaliation.  To prevent recurrences, counseling for the harasser may be appropriate to ensure that he or she understands what constitutes harassment and the effects it can have.  In addition, depending on how widespread the harassment was and whether there have been any prior incidents, the school may need to provide training for the larger school community to ensure that students, parents, and teachers can recognize harassment if it recurs and know how to respond.[96]

### B. Confidentiality

The scope of a reasonable response also may depend upon whether a student, or parent of a minor student, reporting harassment asks that the student's name not be disclosed to the harasser or that nothing be done about the alleged harassment.  In all cases, a school should discuss confidentiality standards and concerns with the complainant initially.  The school should inform the student that a confidentiality request may limit the school's ability to respond.  The school also should tell the student that Title IX prohibits retaliation and that, if he or she is afraid of reprisals from the alleged harasser, the school will take steps to prevent retaliation and will take strong responsive actions if retaliation occurs.  If the student continues to ask that his or her name not be

(Title IX, p. 17, emphasis added)

No student at the University "shall be excluded from participating in" or "be denied the benefits of" any University service, program or activity on the basis of sex, race, and national origin. (University Policy, p.1, emphasis added). "Title IX protects all students at recipient institutions in the United States regardless of national origin, immigration status, or citizenship status." (Title IX Q&A, p.7).

"Under Title IX, federally funded schools must ensure that students of all ages are not denied or limited in their ability to participate in or benefit from the school's educational programs or activities on the basis of sex." (Id., p.1, emphasis added).

"Title IX protects students in connection with all of academic, educational, extra-curricular, athletic, and other programs of the school, whether they take place in the facilities of the school, (…) or elsewhere." (Title IX, pp.2-3, emphasis added).

A recipient institution is also responsible even when the institution was not on notice when an employee engaged in sexual harassment of a student in the context of the employee's provision of aid, benefits, or services to students.

This Court found that Secolsky was a state actor relevant to this Case because, "[t]o any student or outside observer, who did not have access to University personnel files, Secolsky had all the appearance and authority of an employee/instructor at the University of Illinois." (#162, p.36. 15-2136). This Court also found Secolsky liable for Park's Count IX claim as Secolsky deprived Park of her constitutional right to Equal Protection under the Fourteenth Amendment in his "official position" at the University.

This Court's finding of Secolsky as a state actor is consistent with Title IX that holds the University responsible if "an employee who is acting (or who reasonably appears to be acting) in the context of carrying out these responsibilities over students engages in sexual harassment" because Stake allowed Secolsky to take over his authority. Secolsky testified that he was never unsupervised by Stake when it came to his interactions with students at the University. Among other evidence, Secolsky stated he was "authorized to assist students individually with Stake's knowing about it[,]" (Secolsky's MSJ #132, p. 6, 15-2136) and he helped Park with her writing after he "consulted with Stake for help and permission." (id., p.8).

U.S. Department of Education Office for Civil Rights (OCR) states:

A recipient is responsible under the Title IX regulations for the nondiscriminatory provision of aid, benefits, and services to students. Recipients generally provide aid, benefits, and services to students through the responsibilities they give to employees. <u>If an employee who is acting (or who reasonably appears to be acting)</u> in the context of carrying out these responsibilities over students engages in sexual harassment – generally this means harassment that is carried out during an employee's performance of his or her responsibilities in relation to students, including teaching, counseling, supervising, advising, and transporting students – and the harassment denies or limits a student's ability to participate in or benefit from a school program on the basis of sex, [61] the recipient is responsible for the discriminatory conduct.[62] The recipient is, therefore, also responsible for remedying any effects of the harassment on the victim, as well as for ending the harassment and preventing its recurrence. <u>This is true whether or not the recipient has "notice" of the harassment.</u> (Title IX, p.10, emphasis added).

"Indeed, even if a school was not on notice, <u>the school is nonetheless responsible</u> for remedying any effects of the sexual harassment on the student, as well as for ending the sexual harassment and preventing its recurrence, when the employee engaged in the sexual activity in the context of the employee's provision of aid, benefits, or services to students (e.g., teaching, counseling, supervising, advising, or transporting students)" because recipients, institutions "should be careful to satisfy their state and local legal obligations in addition to their Title IX obligations, including training to ensure that school employees are aware of their obligations under such state and local laws and the consequences for failing to satisfy those obligations." (Title IX Q&A, p.4, emphasis added).

Therefore, Defendants are responsible for remedying any effects of Secolsky's sexual harassment <u>before and after</u> Park put Defendants on actual notice on June 21, 2014, as well as ending sexual harassment.

Title IX covers sexual harassment and retaliation of a student conducted by not only an employee, but also a non-employee third party:

"sexually harassing conduct by third parties, who are not themselves employees or students at the school (e.g., a visiting speaker or members of a visiting athletic team), may also be of a sufficiently serious nature to deny or limit a student's ability to participate in or benefit from the education program. As previously outlined in know connection with peer harassment, if the school knows or should know of the harassment, the school is responsible for taking prompt and effective action to eliminate the hostile environment and prevent its recurrence." (Title IX, p.12).

"The school should also explain that Title IX includes protections against retaliation, and that school officials will not only take steps to prevent retaliation but also take strong responsive action if it occurs. This includes retaliatory actions taken by the school and school officials. When a school knows or reasonably should know of possible retaliation by other students or third parties, including threats, intimidation, coercion, or discrimination (including harassment), it must take immediate and appropriate steps to investigate or otherwise determine what occurred. Title IX requires the school to protect the complainant and ensure his or her safety as necessary. See question K-1 regarding retaliation." (Title IX Q&A, pp. 19-20, emphasis added).

**Waiver of Eleventh Amendment Immunity.** Sovereign immunity affords no protection as Defendants violated University Policy; they "acted in violation of statutory or constitutional law or in excess of authority[.]" (*Leetaru v. Board of Trustees of the University of Illinois,* 2015 IL 117485):

> "The doctrine of sovereign immunity affords no protection, however, when it is alleged that the State's agent acted in violation of statutory or constitutional law or in excess of his authority" ¶ 45 (…) [or when] "the official is not doing the business which the sovereign has empowered him or her to do or is doing it in a way which the law forbids. (…)The purpose of the doctrine of sovereign immunity, after all is to 'protect[ ] the State from interference in its performance of the functions of government and preserve[ ] its control over State coffers.' The State cannot justifiably claim interference with its functions when the act complained of is unauthorized or illegal." ¶ 47 (internal citation omitted).

Although Defendants initially stated their obligation to investigate Park's concerns, they took no action and ignored Park's continuous requests. Only after being contacted by Human

Resources did they recklessly look into the matter, violating University Policy. Upon learning

that Defendants were responsible for Secolsky's retaliation against Park, they continued to

violate University Policy and Title IX. Defendants also retaliated by denying Park's OPT as a

valid status and schemed to legitimize that they had no jurisdiction over Park's complaints to

cover up their wrongdoings. Defendants' negligence to Secolsky's misconduct "constitute a

fundamental disregard for core provisions" governing discrimination and harassment at the

University, "thereby exceeding defendants' authority and violating [Park's] constitutional rights

to due process" (Id. at ¶49), which leads to an exception to the doctrine of sovereign immunity.

Defendants' misconduct involves far more than a mere violation of administrative

regulation; it involves multiple violations of Federal Antidiscrimination laws associated with sex,

race, and national origin. The University, therefore, shall not be immune under the Eleventh

Amendment as in 42 U.S.C. § 2000d-7(a)(1) from suit in Federal court for a violation of the

provisions of any Federal statute prohibiting discrimination by recipients of Federal financial

assistance.

42 U.S.C. § 2000d-7(a)(1)
  (1)   General provision
      (2) A State shall not be immune under the Eleventh Amendment of the Constitution of
          the United States from suit in Federal court for a violation of section 504 of the
          Rehabilitation Act of 1973 [29 U.S.C. 794], title IX of the Education Amendments
          of 1972 [20 U.S.C. 1681 et seq.], the Age Discrimination Act of 1975 [42U.S.C.
          6101 *et seq.*], title VI of the Civil Rights Act of 1964 [42 U.S.C. 2000d et seq.], or
          the provisions of any other Federal statute prohibiting discrimination by recipients
          of Federal financial assistance. (emphasis added).

Therefore, neither the doctrine of the Eleventh Amendment sovereign immunity

nor qualified immunity protects Defendants.

# V.   STATEMENT OF CLAIM AND RELIEF Table of Content

## Claim

**Secolsky's sex discrimination** began from January 2014:



"Sexual harassment is a form of sex discrimination" (University Policy, p.2). Secolsky's retaliation, because Park "complained of [Secolsky's] sex discrimination," is another form of "intentional sex discrimination" that constitutes retaliation under Title IX as the Supreme Court held:

> "Retaliation against a person because that person has complained of sex discrimination is another form of intentional sex discrimination (…) retaliation is discrimination 'on the basis of sex' because it is an intentional response to the nature of the complaint: an allegation of sex discrimination."

(Jackson v. Birmingham Board of Education, 544 U.S. 167, at 174).

**Defendants' Responsibilities for Secolsky's sexual harassment and retaliation ("intentional sex discrimination") based on sex, race, and national origin:**

Once Park put Defendants on notice of Secosky's sexual harassment and retaliation, Defendants "should take immediate and appropriate steps to investigate or otherwise determine

what occurred and take prompt and effective steps reasonably calculated to end any harassment, eliminate a hostile environment if one has been created, and prevent harassment from occurring again." (Title IX, p.15).

Defendants are also responsible for Secolsky's sexual harassment before Park put Defendants on actual notice when Secolsky was acting or reasonable appears to be acting in the context of carrying out his performance of his duty at the University. See Title IX, pp. 10-12 and Title IX Q&A, pp.4-5.

Further, Defendants must have taken "immediate and appropriate steps to investigate" when Park put them on notice of Secolsky's retaliation as Title IX states (Title IX Q&A, p.43):

> "Schools should be aware that complaints of sexual violence may be followed by
>
> retaliation against the complainant or witnesses by the alleged perpetrator or his or her associates. When a school knows or reasonably should know of possible retaliation by other students or third parties, it must take immediate and appropriate steps to investigate or otherwise determine what occurred. Title IX requires the school to protect the complainant and witnesses and ensure their safety as necessary."

The University "should ensure that the Title IX coordinator is given the training, authority, and visibility necessary to fulfill these responsibilities" and "the Title IX coordinator must have knowledge of all Title IX reports and complaints at the school" (Title IX, p. 11).

Defendants' failure to carry out their duty led Secolsky to continue his misconduct and subsequent retaliation, which this Court found him liable for causing severe emotional distress and injury to Park.

**The Counts** brought against Defendants regarding their indifference to Secolsky's sexual harassment and retaliation are:

**Denial of Due Process:**

- Count I. Denial of Substantive Due Process [42 U.S.C. § 1983] (Park v. Abdullah-Span, Pratt-Clarke, Hudson, and Johnson in their individual and official capacities). Defendants denied Park's due process by failing to carry out their duty (turning a blind eye to the misconduct) after Park's complaints regarding Secolsky's misconduct.

- Count II. Denial of Substantive Due Process [42 U.S.C. § 1983] (Park v. The Board).

The Board denied Park's due process by promoting policies under which the Officials could refuse to take action after Park's complaints regarding Secolsky's misconduct., see 42 U.S.C. § 1983.

**Title IX —Hostile Environment, Quid Pro Quo, and Retaliation:**

- Count III. Hostile Educational Environment, Title IX of the Education Amendments of 1972 [20 U.S.C. 1681 et seq.] (Park v. The Board). Secolsky's unwelcome sexual harassment constitutes hostile environment harassment when his harassing conduct was sufficiently serious that it denied or limited Park's ability to participate in or benefit from the school's program based on sex. See Title IX, pp. 5-7  for "1. Factors Used to Evaluate Hostile Environment Sexual Harassment."

- Count IV. Quid Pro Quo Title, IX of the Education Amendments of 1972 [20 U.S.C. §1681 et seq.] (Park v. The Board).  Secolsky's unwelcome sexual harassment constitutes quid pro quo harassment when Secolsky conditioned an educational decision, experience, or benefit on Park's submission to unwelcome sexual conduct; whether Park resisted and suffered the threatened harm or submitted and avoided the threatened harm, Park had been treated differently, and/or Park's ability to participate in or benefit from the school's

program has been denied or limited, on the basis of sex in violation of the Title IX

regulations. See Title IX, pp. 9-12  for "1. Harassment by Teachers and Other Employees."

- Count V. Retaliation, Title IX of the Education Amendments of 1972 [20 U.S.C. 1681 et

   seq.] & [28 C.F.R. § 42.107(e)] (Park v. The Board). Because Park "complained of

   [Secolsky's] sex discrimination" Secolsky's retaliation is another form of "intentional sex

   discrimination" that constitutes retaliation under Title IX. (Jackson v. Birmingham Board

   of Education, 544 U.S. 167, at 174).

   Additionally, Defendants' deliberate indifference to Secolsky's sexual harassment of Park

   is "intentional sex discrimination" as the Supreme Court held that:

   > "the private right of action encompasses intentional sex discrimination in the form of a
   > recipient's deliberate indifference to a teacher's sexual harassment of a student,
   > Gebser v. Lago Vista Independent School Dist., 524 U. S. 274, 290-291 (1998)"
   > (Jackson v. Birmingham Board of Education, 544 U.S. 167, at 173).

### Title VI and Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000d–2000d-7, 2000e–2000e-17.

Note: Secolsky's sexual harassment is founded on discrimination as to sex, race and

national origin because Secolsky stated that the reasons he showed Park a pornographic

film and bragged of his sexual exploits were because he "thought that Korean girls, Asian

women, liked white guys" (Secolsky Dep., #128, pp. 114, 15-2136), and because "The

truth of the matter is that I told Park about it would teach her about American culture [.]"

(#138, p. 2, 15-2136).

- Count VI. Sex, Race, & National Origin Discrimination, Title VII of the Civil Rights Act of 1964 [42 U.S.C. 2000e *et seq.*] (Park v. the Board, Abdullah-Span, Pratt-Clarke, Hudson, and Johnson in their individual and official capacities). Defendants allowed Secolsky's sexual harassment based on Park's race and national origin by deliberately ignoring Park's complaints.

- Count VII.  Race & National Origin Discrimination, Title VI of the Civil Rights Act of 1964 [42 U.S.C. 2000d et seq.] (Park v. the Board). Through the Defendants' deliberate indifference to Secolsky's discrimination based on race and national origin, the Board "encourage[d], entreche[d], subsidize[d] or result[ed] in racial [color or national origin] discrimination."[97]

Table of content

**Defendants' Responsibilities for their own discrimination and retaliation based on sex, race, and national origin:**

Statutorily Protected Activity & Adverse Action

"A critical issue under Title IX is whether the school recognized that sexual harassment has occurred and took prompt and effective action calculated to end the harassment, prevent its recurrence, and, as appropriate, remedy its effects." (Title IX, #28-4, p. iii, 15-2136). Defendants did recognize that sexual harassment had occurred but did not take prompt and effective action calculated to end the harassment, prevent its recurrence, and, as appropriate, remedy its effects. Further, Defendants discriminated against Park. While Park contacted Defendants over 60 times, challenging their own discrimination-based retaliation, they began to and continue to claim to

---

[97] https://www.justice.gov/crt/fcs/TitleVI-Overview

this day that they had no jurisdiction over Park's complaints because Park had no status at the

University:[98]

| Park's Statutorily Protected Activity | Defendants' Adverse Action |
|---|---|
| (1) Park's complaint of Secolsky's retaliation (another form of "intentional sex discrimination");<br><br>(2) Park's complaint of Defendants' violation of University Policy, which led to Secolsky's retaliation;<br><br>(3) Park's complaint of Defendants' claim that Secolsky had no status;<br><br>(4) Park's complaint of Defendants' deliberate indifference to Park's original complaints about Secolsky's misconduct and retaliation;<br><br>(5) Park's complaint of Defendants' deliberate indifference to Stake's indifference to Park's original complaints about Secolsky;<br><br>(6) Park's complaint of Defendants' conclusion that Park had no status; | Defendants' claim that they had no jurisdiction over Park's complaints.<br><br>In other words, Defendants' exclusion of Park from University service. |

There existed a but-for causal connection between Park's statutorily protected activity

and Defendants' materially adverse action. After Park informed Defendants of Secolsky's

retaliation, they too began to retaliate, claiming they had no jurisdiction over Park's complaints

because Park had no status. This is another form of "intentional sex discrimination" as the

Supreme Court held that "Retaliation against a person because that person has complained of sex

discrimination is another form of intentional sex discrimination encompassed by Title IX's

---

[98] See Appendix I. Evidence of Defendants' continuous denial of Park's status at the University

private cause of action." (Jackson v. Birmingham Board of Education, 544 U.S. 167, at 174).

Park's persistent protective activity (that concerns Defendants' violation of the provisions of any Federal statute prohibiting discrimination as to sex, race, and national origin listed above) was a "motivating factor" in Defendants' initial and continuous decision to exclude her from their service, which led to Defendants' own discrimination based on sex, race, and national origin for their own harassment. University Policy defines (p.2):

---

**2. Harassment:** Harassment, including sexual harassment, is <u>a form of discrimination</u>. Illinois does not tolerate any form of harassment in work, study or residential life. Illinois considers such behavior - whether physical or verbal - to be a breach of its standards of conduct. It will seek to prevent such incidents and will investigate and take corrective actions in response to alleged or suspected violations of this policy.

    a.  Harassment: Harassment is unwelcome conduct that is based on: race, color, religion, sex, pregnancy, disability, national origin, citizenship status, ancestry, age, order of protection status, genetic information, marital status, sexual orientation including gender identity, arrest record status, military status, and unfavorable discharge from military service. Harassment becomes unlawful when:

- the conduct is severe or pervasive enough to create a work or learning environment that a reasonable person would consider intimidating, hostile, or abusive; and
- enduring the offensive conduct becomes a condition of continued employment or participating in an educational program or activity.

---

Defendants excluded Park from their service because Park took issues with their misconduct regarding her complaints about discrimination based on sex, race, and retaliation. Defendant's conduct was severe enough to create a work or learning environment that Park considered hostile and abusive; challenging their offensive conduct became a condition of

continuing to exclude Park from their services.

Defendants also engaged in discrimination after they failed to apply the necessary steps required by Title IX regarding Park's complaints. Title IX states:

> "If the school fails to take the necessary steps [required by Title IX], however, its failure to act has allowed the student to continue to be subjected to a hostile environment that denies or limits the student's ability to participate in or benefit from the school's program. The school, therefore, has engaged in its own discrimination. It then becomes responsible, not just for stopping the conduct and preventing it from happening again, but for remedying the effects of the harassment on the student that could reasonably have been prevented if the school had responded promptly and effectively." (Title IX, p.12, emphasis added).

Defendants then became responsible, not only for stopping Secosky's misconduct, preventing it from happening again, and remedying the effects of the harassment, but for denying Park's ability to benefit from the University service as well.

Furthermore, the means of Defendants' exclusion of Park from their service was to claim Park had no status at the University; they have not considered Park's OPT as a valid status to this day, which leads to national origin discrimination and defamation.

For the foregoing reasons, Defendants engaged in not only Secolsky's discrimination or harassment against Park because of sex. race, and national origin, but also in their own discrimination based on sex. race, and national origin. Therefore, neither the doctrine of the Eleventh Amendment sovereign immunity nor the qualified immunity protects Defendants.

Table of content

**The Counts** brought against Defendants regarding <u>their own harassment and retaliation</u>

are:

---

**<u>Retaliation (State Law)</u>**

- Count VIII. Retaliation, [775 ILCS 5, *et seq.]* (Park v. Abdullah-Span, Pratt-Clarke, Hudson, and Johnson in their individual and official capacities). Defendants retaliated against Park (excluded her from University service) for coming forward with her various complaints about Defendants' own misconduct.

**<u>Retaliation (Federal Law)</u>**

Title IX states (Title IX Q&A, p.42):
"The Federal civil rights laws, including Title IX, make it unlawful to retaliate against an individual for the purpose of interfering with any right or privilege secured by these laws. This means that if an individual brings concerns about possible civil rights problems to a school's attention (…) , it  is unlawful for the school to retaliate against that individual for doing so."

The United States Code states, in pertinent part,

"All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts …,and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens[.]" 42 U.S.C. § 1981.

- Count IX. Retaliation [42 U.S.C. § 1981] (Park v. Abdullah-Span, Pratt-Clarke, Hudson, and Johnson in their individual and official capacities). Park's complaints about racial discrimination to Defendants were activities under 42 U.S.C. § 1981. Defendants' adverse action was to remove Park from the enjoyment of all benefits of the University services through her OPT contract by claiming that Park had no status at the University.

---

- Count X. Retaliation [42 U.S.C. § 1981] (Park v. The Board). The policy and custom of the University of Illinois allowed the Officials' retaliation suffered by Park.

  The retaliation against Park by Defendants caused Park to suffer ongoing injury and severe emotional distress and educational harm that will continue.

**Title IX —Hostile Environment, Quid Pro Quo, and Retaliation:**

- Count XI. Hostile Educational Environment, Title IX of the Education Amendments of 1972 [20 U.S.C. 1681 et seq.] (Park v. The Board). Defendants excluded Park from their service because Park took issues with Defendants' misconduct regarding Park's complaints about discrimination based on sex. This harassment constitutes hostile environment harassment when their harassing conduct was sufficiently serious that it denied or limited Park's ability to participate in or benefit from the University service. See Title IX, pp. 5-7  for "1. Factors Used to Evaluate Hostile Environment Sexual Harassment."

- Count XII. Quid Pro Quo Title, IX of the Education Amendments of 1972 [20 U.S.C. §1681 et seq.] (Park v. The Board). Defendants' discrimination/harassment based on sex constitutes quid pro quo harassment when they conditioned an educational decision, experience, or benefit on Park's submission to the discrimination/ harassment; whether Park resisted and suffered the threatened harm or submitted and avoided the threatened harm, Park had been treated differently, and/or Park's ability to participate in or benefit from the school's program has been denied or limited, on the basis of sex in violation of

the Title IX regulations. See Title IX, pp. 9-12 for "1. Harassment by Teachers and Other Employees."

- Count XIII. Retaliation, Title IX of the Education Amendments of 1972 [20 U.S.C. 1681 et seq.] & [28 C.F.R. § 42.107(e)] (Park v. The Board). Defendants' retaliation against Park for coming forward with her complaints of Secolsky's retaliation is another form of "intentional sex discrimination" that constitutes retaliation under Title IX.

**Title VI and Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000d–2000d-7, 2000e–2000e-17.**

- Count XIV. Sex, Race, & National Origin Discrimination, Title VII of the Civil Rights Act of 1964 [42 U.S.C. 2000e et seq.] (Park v. the Board, Abdullah-Span, Pratt-Clarke, Hudson, and Johnson in their individual and official capacities). Defendants discriminated against Park based on sex, race, and national origin by deliberately retaliating against Park when she complained about Defendant's various discrimination.

- Count XV. Race & National Origin Discrimination, Title VI of the Civil Rights Act of 1964 [42 U.S.C. 2000d et seq.] (Park v. the Board). Through the Officials' discrimination based on race and national origin, the Board "encourage[d], entreche[d], subsidize[d] or result[ed] in racial [color or national origin] discrimination."[99]

Table of content

---

[99] https://www.justice.gov/crt/fcs/TitleVI-Overview

**Defamation**

Defendants have made a defamatory false statement that Park had no status at the
University (neither a student nor employee) at the time of the investigation to this day.

- Count XVI. Defamation, Common law and Illinois Defamation Law (Park v. Abdullah-
  Span, Pratt-Clarke, Hudson, and Johnson in their individual and official capacities).

- Count XVII.  Defamation, Common law and Illinois Defamation Law (Park v. the
  Board).

  The statute of limitations for defamation in Illinois, 735 IL CS 5/13-201 (one year) does
  not apply to the current case because Defendants still proclaims that  Park"was neither a
  student nor an employee on the campus" in 2014.

**Miscellaneous Counts**

- Count XVIII. Intentional Infliction of Emotional Distress (Park v. Abdullah-Span, Pratt-
  Clarke, Hudson, and Johnson in their individual and official capacities). Defendants
  knew Park had seen her psychiatrist due to her emotional distress.[100] Any reasonable
  person would conclude that improper actions from Defendants led to continuous sexual
  harassment and retaliation and added an enormous amount of stress to Park's already
  existing stress and suffering caused by Secolsky and Stake.

- Count XIX. Respondeat Superior (Park v. The Board). The Counts against Defendants'
  official capacities lead to the respondeat superior Count against the Board of Trustees for
  Abdullah-Span, Pratt-Clarke, Hudson, & Johnson's OFFICIAL acts.

---

[100] See Appendix for Hudson's meeting note dated on June 26, 2014 that reads "Dr. Arthur Traugott,
Psychiatry at Carle."

**Injury.** It is difficult to isolate injuries from (1) Stake's sexual misconduct, deliberate indifference, retaliation, and his malicious fabrications; (2) Secolsky's sexual misconduct and retaliation; (3) University Defendants' deliberate indifference, retaliation, and their malicious fabrications as everything is intertwined.

Park bravely came to the US as a single mother and invested 14 years in education, only to endure sexual misconduct for 4 of those years followed by 6 years of pain and depression due to fabrications in the federal court system. Regardless of the effort she put into earning Ph.D., Park has neither met her family's expectations nor her own with nothing to show for the last 20 years.

Defendants' deplorable crimes and inhumane disregard caused Park to suffer severe physical, psychological, and emotional damage (requiring psychiatric & therapeutic treatment); they are also responsible for educational damages and economic injury as Park was left unable to work since October 2014 and is still affected to this day. Further, Park suffered PTSD-induced panic attacks, respiratory and cardiac complications, and one life-threatening heart attack.

The damages are beyond calculation; not only did their inexcusable negligence and failure to help Park destroy everything she had worked for, all Defendants contributed in jeopardizing Lisa Park's very life:[101]

Jose Ochoa, MD from the Emergency Department wrote "Pt with a lot of stress and has flashbacks to the harassment." He continued to state "she may die if not fully evaluated."

---

[101] See Appendix I. Evidence of Park's psychological and physical injuries for the note.  See also Appendix II. e. Additional Significant Medical Records.

Like the lady who sent Park the package, Park also feared that filing an official complaint would cause Stake and Secolsky to retaliate by sabotaging her publications and career, which is exactly what happened.

There are countless instances of sexual harassment that go unreported due to shame and fear of retaliation. It is a daily, ongoing practice where men in powerful positions abuse their authority to sexually abuse others both within and outside university context.

Although more women are beginning to come forward, there are still many victims who hide in fear and suffer quietly. According to the U.S. Equal Employment Opportunity Commission (EEOC), 87-94% of victims did not file a formal complaint due to fear of retaliation. EEOC reported, "One 2003 study found that 75% of employees who spoke out against workplace mistreatment faced some form of retaliation."[102]

It's sickening to think of the number of men and women who have endured sexual abuse and even more so to think of those who have yet to fall victim to these predators. How long will we let these predators go unpunished? How long will we allow them to roam amongst us, hunting their next prey? It is our responsibility to unite and fight together; to protect the lives of the innocent and weak. We must act now.

We must act now; for our fathers and mothers who have already suffered.

For our brothers and sisters who are currently suffering.

For our future children, who shall never suffer.

---

[102] https://www.eeoc.gov/select-task-force-study-harassment-workplace

# Relief

Table of content

**Count I.** Denial of Substantive Due Process [42 U.S.C. § 1983] (Park v. Abdullah-Span, Pratt-Clarke, Hudson, and Johnson in their individual and official capacities).

WHEREFORE, Plaintiff respectfully prays this Court enter Judgment in favor of Plaintiff, Park, and against Defendants Abdullah-Span, Pratt-Clarke, Hudson, and Johnson, to award her compensatory damages of $3,000,000.00, punitive damages of $2,000,000.00, and the costs of this action; and to grant such other relief as the Court may deem just and proper.

**Count II.** Denial of Substantive Due Process [42 U.S.C. § 1983] (Park v. The Board).

WHEREFORE, Plaintiff respectfully pray this Court enter Judgment in favor of Plaintiff, Park, and against Defendant the Board of Trustees of the University of Illinois, to award her compensatory damages of $5,000,000.00, punitive damages of $5,000,000.00, and the costs of this action; and to grant such other relief as this Court deems just and proper.

**Count III.** Hostile Educational Environment, Title IX of the Education Amendments of 1972 [20 U.S.C. 1681 et seq.] (Park v. The Board).

WHEREFORE, Plaintiff respectfully pray this Court enter Judgment in favor of Plaintiff, Park, and against Defendant the Board of Trustees of the University of Illinois, to award her compensatory damages of $5,000,000.00, punitive damages of $5,000,000.00, and the costs of this action; and to grant such other relief as this Court deems just and proper.

**Count IV.** Quid Pro Quo Title, IX of the Education Amendments of 1972 [20 U.S.C. §1681 et seq.] (Park v. The Board).

WHEREFORE, Plaintiff respectfully pray this Court enter Judgment in favor of Plaintiff, Park, and against Defendant the Board of Trustees of the University of Illinois, to award her compensatory damages of $5,000,000.00, punitive damages of $5,000,000.00, and the costs of this action; and to grant such other relief as this Court deems just and proper.

**Count V.** Retaliation, Title IX of the Education Amendments of 1972 [20 U.S.C. 1681 et seq.] & [28 C.F.R. § 42.107(e)] (Park v. The Board).

WHEREFORE, Plaintiff respectfully pray this Court enter Judgment in favor of Plaintiff, Park, and against Defendant the Board of Trustees of the University of Illinois, to award her compensatory damages of $5,000,000.00, punitive damages of $5,000,000.00, and the costs of this action; and to grant such other relief as this Court deems just and proper.

**Count VI.** Sex, Race, & National Origin Discrimination, Title VII of the Civil Rights Act of 1964 [42 U.S.C. 2000e et seq.] (Park v. the Board, Abdullah-Span, Pratt-Clarke, Hudson, and Johnson in their individual and official capacities).

WHEREFORE, Plaintiff respectfully pray this Court enter Judgment in favor of Plaintiff, Park, and against Defendant the Board of Trustees of the University of Illinois, to award her compensatory damages of $5,000,000.00, punitive damages of $5,000,000.00, and the costs of this action; and to grant such other relief as this Court deems just and proper.

WHEREFORE, Plaintiff respectfully prays this Court enter Judgment in favor of Plaintiff, Park, and against Defendants Abdullah-Span, Pratt-Clarke, Hudson, and Johnson, to award her compensatory damages of $3,000,000.00, punitive damages of $2,000,000.00, and the costs of this action; and to grant such other relief as the Court may deem just and proper.

**Count VII.**  Race & National Origin Discrimination, Title VI of the Civil Rights Act of 1964 [42 U.S.C. 2000d et seq.] (Park v. the Board).

WHEREFORE, Plaintiff respectfully pray this Court enter Judgment in favor of Plaintiff, Park, and against Defendant the Board of Trustees of the University of Illinois, to award her compensatory damages of $5,000,000.00, punitive damages of $5,000,000.00, and the costs of this action; and to grant such other relief as this Court deems just and proper.

**Count VIII.**  Retaliation, [775 ILCS 5, et seq.] (Park v. Abdullah-Span, Pratt-Clarke, Hudson, and Johnson in their individual and official capacities).

WHEREFORE, Plaintiff respectfully prays this Court enter Judgment in favor of Plaintiff, Park, and against Defendants Abdullah-Span, Pratt-Clarke, Hudson, and Johnson, to award her compensatory damages of $3,000,000.00, punitive damages of $2,000,000.00, and the costs of this action; and to grant such other relief as the Court may deem just and proper.

**Count IX.** Retaliation [42 U.S.C. § 1981] (Park v. Abdullah-Span, Pratt-Clarke, Hudson, and Johnson in their individual and official capacities).

WHEREFORE, Plaintiff respectfully prays this Court enter Judgment in favor of Plaintiff, Park, and against Defendants Abdullah-Span, Pratt-Clarke, Hudson, and Johnson, to award her compensatory damages of $3,000,000.00, punitive damages of $2,000,000.00, and the costs of this action; and to grant such other relief as the Court may deem just and proper.

**Count X.** Retaliation [42 U.S.C. § 1981] (Park v. The Board).

WHEREFORE, Plaintiff respectfully pray this Court enter Judgment in favor of Plaintiff, Park, and against Defendant the Board of Trustees of the University of Illinois, to award her compensatory damages of $5,000,000.00, punitive damages of $5,000,000.00, and the costs of this action; and to grant such other relief as this Court deems just and proper.

**Count XI.** Hostile Educational Environment, Title IX of the Education Amendments of 1972 [20 U.S.C. 1681 et seq.] (Park v. The Board).

WHEREFORE, Plaintiff respectfully pray this Court enter Judgment in favor of Plaintiff, Park, and against Defendant the Board of Trustees of the University of Illinois, to award her compensatory damages of $5,000,000.00, punitive damages of $5,000,000.00, and the costs of this action; and to grant such other relief as this Court deems just and proper.

**Count XII.** Quid Pro Quo Title, IX of the Education Amendments of 1972 [20 U.S.C. §1681 et seq.] (Park v. The Board).

WHEREFORE, Plaintiff respectfully pray this Court enter Judgment in favor of Plaintiff, Park, and against Defendant the Board of Trustees of the University of Illinois, to award her compensatory damages of $5,000,000.00, punitive damages of $5,000,000.00, and the costs of this action; and to grant such other relief as this Court deems just and proper.

**Count XIII.** Retaliation, Title IX of the Education Amendments of 1972 [20 U.S.C. 1681 et seq.] & [28 C.F.R. § 42.107(e)] (Park v. The Board).

WHEREFORE, Plaintiff respectfully pray this Court enter Judgment in favor of Plaintiff, Park, and against Defendant the Board of Trustees of the University of Illinois, to award her compensatory damages of $5,000,000.00, punitive damages of $5,000,000.00, and the costs of this action; and to grant such other relief as this Court deems just and proper.

**Count XIV.** Sex, Race, & National Origin Discrimination, Title VII of the Civil Rights Act of 1964 [42 U.S.C. 2000e et seq.] (Park v. the Board, Abdullah-Span, Pratt-Clarke, Hudson, and Johnson in their individual and official capacities).

WHEREFORE, Plaintiff respectfully pray this Court enter Judgment in favor of Plaintiff, Park, and against Defendant the Board of Trustees of the University of Illinois, to award her compensatory damages of $300,000.00, and the costs of this action; and to grant such other relief as this Court deems just and proper.

WHEREFORE, Plaintiff respectfully prays this Court enter Judgment in favor of Plaintiff, Park, and against Defendants Abdullah-Span, Pratt-Clarke, Hudson, and Johnson, to award her compensatory damages of $3,000,000.00, punitive damages of $2,000,000.00, and the costs of this action; and to grant such other relief as the Court may deem just and proper.

**Count XV.**  Race & National Origin Discrimination, Title VI of the Civil Rights Act of 1964 [42 U.S.C. 2000d et seq.] (Park v. the Board).

WHEREFORE, Plaintiff respectfully pray this Court enter Judgment in favor of Plaintiff, Park, and against Defendant the Board of Trustees of the University of Illinois, to award her compensatory damages of $5,000,000.00, punitive damages of $5,000,000.00, and the costs of this action; and to grant such other relief as this Court deems just and proper.

**Count XVI.** Defamation, Common law and Illinois Defamation Law (Park v. Abdullah-Span, Pratt-Clarke, Hudson, and Johnson in their individual and official capacities).

WHEREFORE, Plaintiff respectfully prays this Court enter Judgment in favor of Plaintiff, Park, and against Defendants Abdullah-Span, Pratt-Clarke, Hudson, and Johnson, to award her compensatory damages of $3,000,000.00, punitive damages of $2,000,000.00, and the costs of this action; and to grant such other relief as the Court may deem just and proper.

**Count XVII.**  Defamation, Common law and Illinois Defamation Law (Park v. the Board).

WHEREFORE, Plaintiff respectfully pray this Court enter Judgment in favor of Plaintiff, Park, and against Defendant the Board of Trustees of the University of Illinois, to award her compensatory damages of $5,000,000.00, punitive damages of $5,000,000.00, and the costs of this action; and to grant such other relief as this Court deems just and proper.

**Count XVIII.** Intentional Infliction of Emotional Distress (Park v. Abdullah-Span, Pratt-Clarke, Hudson, and Johnson in their individual and official capacities).

WHEREFORE, Plaintiff respectfully prays this Court enter Judgment in favor of Plaintiff, Park, and against Defendants Abdullah-Span, Pratt-Clarke, Hudson, and Johnson, to award her compensatory damages of $3,000,000.00, punitive damages of $2,000,000.00, and the costs of this action; and to grant such other relief as the Court may deem just and proper.

**Count XIX.** Respondeat Superior (Park v. The Board).

WHEREFORE, Plaintiff respectfully pray this Court enter Judgment in favor of Plaintiff, Park, and against Defendant the Board of Trustees of the University of Illinois, to award her

compensatory damages of $10,000,000.00, punitive damages of $10,000,000.00, and the costs of this action; and to grant such other relief as this Court deems just and proper.

<div align="center">

**VIII.     CONCLUSION**          Table of content

</div>

WHEREFORE, for the above and foregoing reasons, the Plaintiff, HYE-YOUNG PARK respectfully submits this Complaint.

<div align="right">

Respectfully summitted,
Date: April 25, 2019
Pro se, Plaintiff, Hye-Young Park

101 Paddock Dr. E. Apt # A3
Savoy, IL 61874
Cell Number: 217-766-4752
hpark15hpark@gmail.com

</div>

# IX.    STATEMENT OF VERIFICATION    Table of content

I have read the above complaint and it is correct to the best of my knowledge.

Respectfully summitted,
Date: May 29, 2020
Pro se, Plaintiff, Hye-Young Park

101 Paddock Dr. E. Apt # A3
Savoy, IL 61874
Cell Number: 217-766-4752
hpark15hpark@gmail.com

# X.       JURY DEMAND UNDECIDED      Table of content

Plaintiff requests that this Court allow Park to decide whether or not she would like a trial

by a jury of twelve at a later time.

Respectfully summitted,
Date: May 29, 2020
Pro se, Plaintiff, Hye-Young Park

101 Paddock Dr. E. Apt # A3
Savoy, IL 61874
Cell Number: 217-766-4752
hpark15hpark@gmail.com

# XI.          CERTIFICATE OF SERVICE          Table of content

"General Order 20-02 dated March 26, 2020, allowing non-incarcerated pro se litigants the option to submit filings via email with complying with the terms of the Order shall remain effective through May 30, 2020[.]"

Following this rule, Plaintiff Park hereby certifies that on May 29, 2020, Park electronically filed the foregoing and appendices with the Clerk of the Court using their email system which allows Park to send a carbon copy ("cc") to all parties involved.

Respectfully summitted,
Date: May 29, 2020
Pro se, Plaintiff, Hye-Young Park

101 Paddock Dr. E. Apt # A3
Savoy, IL 61874
Cell Number: 217-766-4752
hpark15hpark@gmail.com